**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

Eastern District of Kentucky
**FILED**

MAR 2 3 2006

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

| | |
|---|---|
| TIM IRWIN, Derivatively and on Behalf of Nominal Defendant, OMNICARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOEL F. GEMUNDER,  DAVID W. FROESEL, JR., EDWARD L. HUTTON, JOHN T. CROTTY, CHARLES H. ERHART, JR., SANDRA E. LANEY, ANDREA R. LINDELL, JOHN H. TIMONEY and AMY WALLMAN, <br><br> Defendants, <br><br> and <br><br> OMNICARE, INC., <br><br> Nominal Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Case No. 2-06-CV-62 <br><br><br> WILLIAM O. BERTELSMAN <br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Comes Plaintiff, Tim Irwin ("Plaintiff"), derivatively and on behalf of Nominal Defendant Omnicare, Inc., by and through his undersigned attorneys, and for his Complaint against Defendants herein, alleges the following based upon personal knowledge of the Plaintiff, and on information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the Defendants, United States Securities and Exchange

- 1 -

Commission ("SEC") filings, wire and press releases published by and regarding Omnicare, Inc. (hereafter "Omnicare" or the "Company") and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.       This is a shareholder derivative action brought by Plaintiff and shareholders of Omnicare against certain current or former officers and directors of Omnicare seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from August 3, 2005 through the present, (the "Relevant Period") and that have caused substantial losses to the Company. [1]

2.       Omnicare provides pharmaceutical care for elderly people primarily in the United States and Canada. The Company operates through two segments, Pharmacy Services and Contract Research Organization Services. The Company is headquartered in Covington, Kentucky.

3.       During the Relevant Period, defendants made false and misleading statements regarding the Company's business and prospects. The true facts, which were known by each of the Defendants but concealed from the investing public during the Relevant Period, were as follows:

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between August 3, 2005 and January 27, 2006, the Relevant Period continues through this day instead of ceasing on January 27, 2006, the day before the public became aware of the wrongdoings at the Company.

a. The Company was artificially inflating its earnings by engaging in improper generic drug substitution. Specifically, the Company was substituting capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac; giving tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and substituting two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar.

b. The Company was not in compliance with Medicare laws.

c. The Company's strategy was *not* sound. In fact, the implementation of Medicare Part D had dramatically increased the Company's costs and increased the number of rejected Medicare claims to nearly 40%.

d. The Company was not "well-positioned to add value under the new Medicare Part D" Plan. Rather, the Company lacked adequate staff and internal compliance controls to ensure the Company could benefit from the new plan. Instead, Part D wreaked havoc on the Company's business model, sending costs, rejection rates and receivables far higher than shareholders were led to believe.

4.      As a result of the Defendants' false statements, Omnicare stock traded at inflated levels during the Relevant Period, trading as high as $61.85 per share, and the Company was able to complete offerings of more than $2.5 billion worth of securities.

- 3 -

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

6.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Omnicare maintains its corporate headquarters in this District.  Further, Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## THE PARTIES

9.     Plaintiff, Tim Irwin, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Omnicare.  Plaintiff is a resident of the State of North Dakota.

10.     Nominal Defendant Omnicare is a Delaware corporation with its principal place of business located at 100 E. Rivercenter Blvd., Suite 1600, Covington, Kentucky

- 4 -

41101. Omnicare provides pharmaceutical care for elderly people primarily in the United States and Canada. The Company operates through two segments, Pharmacy Services and Contract Research Organization Services.

11. Defendant Joel F. Gemunder ("Gemunder") is a resident of the Commonwealth of Kentucky. He is Chief Executive Officer, President and a Director of Omnicare. During the Relevant Period, Gemunder assisted the Company in selling more than $2.5 billion worth of Omnicare securities.

12. Defendant David W. Froesel, Jr. ("Froesel") is a resident of the Commonwealth of Kentucky. He is the Chief Financial Officer, Senior Vice President and a Director of Omnicare. During the Relevant Period, Froesel assisted the Company in selling more than $2.5 billion worth of Omnicare securities.

13. Defendant Edward L. Hutton ("Hutton") is a resident of the State of Ohio. He has been a member of Omnicare's Board of Directors since 1981.

14. Defendant John T. Crotty ("Crotty") is a resident of the Commonwealth of Virginia. He has been a member of Omnicare's Board of Directors since 2004.

15. Defendant Charles H. Erhart, Jr. ("Erhart") is a resident of the State of New York. He has been a member of Omnicare's Board of Directors since 1981.

16. Defendant Sandra E. Laney ("Laney") is a resident of the State of Ohio. She has been a member of Omnicare's Board of Directors since 1987.

17. Defendant Andrea R. Lindell ("Lindell") is a resident of the State of Ohio. She has been a member of Omnicare's Board of Directors since 1992.

18.     Defendant John H. Timoney ("Timoney") is a resident of the Commonwealth of Kentucky.  He has been a member of Omnicare's Board of Directors since 2000.

19.     Defendant Amy Wallman ("Wallman") is a resident of the State of Florida. She has been a member of Omnicare's Board of Directors since 2004.

20.     The individuals named as Defendants in Paragraphs 11-19 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Omnicare's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

21.     In addition to the above-described involvement, each Individual Defendant had knowledge of Omnicare's problems and was motivated to conceal such problems. Froesel, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing Omnicare's forecasted and actual growth were prepared by the finance department under Froesel's direction. Defendant

- 6 -

Gemunder, as CEO, was responsible for the financial results and press releases issued by the Company.

22.     Each Individual Defendant is liable for (i) making false statements, **or** (ii) failing to disclose adverse facts known to him about Omnicare. Defendants' fraudulent scheme and course of business (i) deceived the investing public regarding Omnicare's prospects and business; (ii) allowed Defendants to obtain larger bonuses which were directly tied to the performance of Omnicare; and (iii) allowed Defendants to complete offerings of $2.5 billion worth of Omnicare securities.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or Directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each Director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.    The Individual Defendants, because of their positions of control and authority as Directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.  exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.  exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.  when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

26.    The Individual Defendants were responsible for maintaining and establishing adequate internal controls for the Company. According to Statement on Auditing Standards No. 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

### SUBSTANTIVE ALLEGATIONS

27.    Omnicare provides pharmaceutical care for elderly people primarily in the United States and Canada. The Company operates through two segments, Pharmacy Services and Contract Research Organization Services.

- 8 -

28.    By Fall 2005, investors were becoming increasingly concerned about the Company's transition to Medicare Part D (effective January 1, 2006) and volume-based rebates that Omnicare earned from pharmaceutical manufacturers. Rumors relating to the Company's lack of preparedness for the program were downplayed by Defendants' rosy projections.

29.    In truth, the implementation of the Medicare Part D program was more challenging than Defendants revealed and was negatively impacting the Company's future earnings ability, and the Company was struggling to overcome major glitches associated with the new program. In addition, the Company had learned that federal and state officials had begun investigating allegations surrounding three generic drugs that it supplied to its nursing home patients and was fielding questions from a federal prosecutor about its relationship with certain drug manufacturers.

30.    The first probe involved Omnicare directly. Based on a regulatory filing, the government sought information about the pills the Company supplied to treat three common ailments. Specifically, the government questioned whether Omnicare improperly substituted two 7.5-milligram Buspirone anti-anxiety tablets for one 15-milligram tablet, Fluoxetine anti-depression tablets for capsules, and Ranitidine heartburn capsules for tablets.

31.    Omnicare had been under fire for executing similar switches in the past. Notably, in 2004, Omnicare paid a $1 million fine for changes involving a single drug – Ranitidine – in the state of Maine. The Company allegedly switched patients from Ranitidine tablets costing $15.10 a month to Ranitidine capsules costing $82.77 a month instead. When announcing the settlement in mid-2004, Maine Attorney General

- 9 -

Steven Rowe said the drug switches were initiated specifically to increase revenue to Omnicare of Maine. He added, "The so-called 'Ranitidine Initiative' at Omnicare was developed to lessen the impact of a June 2000 federal capping of the Medicaid reimbursement rate for Ranitidine tablets. The reimbursement rate for capsules was not capped." Prior to the reimbursement change, Rowe's office stated, less than 5% of Omnicare of Maine patients who took Ranitidine received the capsule form. But after the change, the office said, that number rocketed to 95%. "I have been outraged by this case all along," Rowe said at the time. As part of the 2004 settlement, Omnicare of Maine agreed to "remain under constant monitoring by its parent company's compliance officer."

32.    On August 3, 2005, the Company issued a press release entitled "Omnicare Reports Second Quarter 2005 Results," which stated in part:

– Sales Reach Record Highs

– Adjusted Earnings In Line With Expectations

– Recent Acquisitions Provide Strong Platform for Future Growth

Omnicare, Inc., the nation's leading provider of pharmaceutical care for the elderly, reported today financial results for its second quarter ended June 30, 2005.

Financial results for the quarter ended June 30, 2005, as compared with the prior-year period, including the special charge and accounting change noted below, were as follows:

– Earnings per diluted share were 59 cents versus 55 cents

– Net income was $61.7 million as compared with $60.5 million

– Sales reached $1,123.4 million as compared with $1,010.6 million

The second quarter of 2005 includes a special charge of approximately $1.1 million pretax for acquisition-related expenses pertaining to a proposed transaction that was not consummated. In addition, the diluted earnings per share for all periods reflect the Company's fourth quarter

2004 adoption of Emerging Issues Task Force Issue No. 04-8 (EITF No. 04-8) related to the calculation of diluted earnings per share for contingently convertible securities. Adjusting for this special item and the accounting change, results for the quarters ended June 30, 2005 and 2004, respectively, were as follows:

– Adjusted earnings per diluted share were 60 cents versus 58 cents

– Adjusted net income was $62.5 million as compared with $60.5 million

– Sales reached $1,123.4 million as compared with $1,010.6 million

Commenting on the results for the quarter, Joel F. Gemunder, Omnicare's president and chief executive officer, said, "*The second quarter was one of the most important periods in Omnicare's history, highlighted by the continued solid financial performance of our business*, as well as the significant progress we made toward acquiring NeighborCare, RxCrossroads and excelleRx -- three major transactions that we believe will transform our company and provide us with *a solid platform for future growth. Our sales once again hit record highs, and our operating margins improved on a sequential basis, reflecting the growing benefits of our cost reduction and productivity enhancement initiatives*. As a result, our adjusted second quarter earnings per share were in line with our expectations and consensus estimates."

\*        \*        \*

"*The continued execution of our acquisition strategy is driving strong sales growth in our pharmacy business, and we will see additional growth in coming quarters as we begin integrating NeighborCare's business into our operations*," said Gemunder. "*Sales growth is also being aided by year-over-year increases in occupancy and acuity in many areas, the expansion of our clinical and other service programs, drug price inflation and market penetration of newer branded drugs, offset, in part, by the increasing use of generic drugs*.

"We are pleased that our sales growth was achieved despite the ongoing trends in government reimbursement reductions, both state and federal, as well as intense competitive pricing pressures throughout the industry. *The productivity enhancement and cost reduction programs we initiated over the past year have helped to partially offset these trends and improve our operating margins on a sequential basis*. Additionally, our performance under a previously announced disease management demonstration project provided an anticipated benefit of approximately $4 million, representing our annual medication

- 11 -

management performance payment. Annual medication management payments under this project are expected to continue over at least the next two years. We continue to look toward additional growth opportunities in the disease management arena that utilize our core clinical strengths and distribution assets."

*     *     *

*Omnicare Outlook*

*In commenting on the outlook for Omnicare and the industry, Gemunder said, "We continue to see relative stability in the long-term care industry. Of course, we are continuing to monitor developments related to healthcare funding, including the efforts of the federal government and state Medicaid programs to contain or reduce costs, either through the legislative process or other means.*

*"Most importantly, we have been focused on the upcoming implementation of the Medicare drug benefit effective January 1, 2006. Under the new Medicare Part D benefit, Prescription Drug Plans, or PDPs, sponsored by commercial insurers or other risk-bearing entities approved by the Centers for Medicare and Medicaid Services (CMS) will offer a drug benefit to Medicare-eligible beneficiaries, including those dually eligible under Medicaid, which will include many residents of the skilled nursing facilities we serve.*

*"We have been actively involved in negotiations with Medicare Part D Plans during the quarter regarding our participation in their pharmacy networks to deliver pharmacy services for their beneficiaries in long-term care facilities. We are pleased with the progress of these negotiations. To date, Omnicare has signed agreements covering more than 100 Medicare Part D Plans across the United States, including a number of organizations planning to provide national coverage as well as numerous agreements with regional and local plans also intending to provide the Medicare Prescription Drug Benefit beginning in 2006."*

*"There are still many specifics yet to be determined through sub-regulatory guidance by CMS, as well as the approval of specific PDPs by CMS," said Gemunder. "All things considered, we see nothing materially adverse about the regulations at this time and believe we are well-positioned to add value under the new Medicare Part D benefit. We will monitor developments and continue to ready our company as the year progresses.*

*"Over the next several months, we will be proceeding in a careful, measured way to integrate NeighborCare into our existing*

- 12 -

*operations. As we have said previously, we expect to generate economies of scale in drug purchasing and through consolidation of duplicate operational functions and geographic locations.   We expect the acquisition to be significantly accretive to Omnicare's diluted earnings per share in 2006 and beyond.*

*"While we continue to address the challenges presented by pricing and reimbursement issues, we remain focused on Omnicare's proven growth strategy - one that has allowed us to provide long-term shareholder value in all types of industry conditions. Overall, our revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our sound strategy, combined with our demonstrated ability to maintain financial strength and flexibility, and the numerous opportunities to leverage our business both through internal and external growth," concluded Gemunder.*

33.    On November 2, 2005, the Company issued a press release entitled

"Omnicare Reports Third Quarter 2005 Results," which stated in part:

-- Sales and Adjusted Earnings Reach Record Highs

-- Strong Cash Flow from Operations

-- Acquisition Integration Plans Underway

Omnicare, Inc., the nation's leading provider of pharmaceutical care for the elderly, reported today financial results for its third quarter ended September 30, 2005.

Financial results for the quarter ended September 30, 2005, as compared with the prior-year period, including a restructuring charge and other special items, as well as the accounting change noted below, were as follows:

-- Earnings per diluted share were 54 cents versus 52 cents

-- Net income was $58.5 million as compared with $55.9 million

-- Sales reached $1,455.0 million as compared with $1,053.9 million

Results for both the third quarter 2005 and 2004 include special items (described later herein) of $16.4 million pretax and $5.2 million pretax, respectively. In addition, the diluted earnings per share for all periods reflect the Company's fourth quarter 2004 adoption of Emerging Issues Task Force Issue No. 04-8 (EITF No. 04-8) related to the calculation of diluted earnings per share for contingently convertible securities. Adjusting

- 13 -

for these special items and the accounting change, results for the quarters ended September 30, 2005 and 2004, respectively, were as follows:

-- Adjusted earnings per diluted share were 64 cents versus 57 cents

-- Adjusted net income was $68.8 million as compared with $59.1 million

-- Sales reached $1,455.0 million as compared with $1,053.9 million

It should also be noted that, given the appreciation in the Company's stock price during the third quarter of 2005, the average number of diluted shares outstanding rose to 108,038,000 on a sequential basis, reflecting primarily the dilution related to the Company's 4% Trust PIERS (4.00% junior subordinated convertible debentures due 2033 underlying Trust Preferred Income Equity Securities), as well as the dilutive impact of stock options. Triggered by average prices above $40.82 for Omnicare stock, dilution on the Trust PIERS is calculated on the treasury stock method of accounting, which calculation, along with the impact of stock options, reduced diluted earnings per share by approximately 2 cents, for the third quarter of 2005.

***Commenting on the results for the quarter, Joel F. Gemunder, Omnicare's president and chief executive officer, said, "Our results for the third quarter underscore Omnicare's ongoing transformation and commitment to financial performance. We closed three important acquisitions - RxCrossroads, excelleRx and NeighborCare, the largest in our history. Moreover, we made substantial progress in our integration of NeighborCare as well as in our other initiatives to reduce our costs and enhance productivity. As a result, sales reached a record high and our adjusted third quarter earnings per share were well in line with expectations."***

Cash Flow from Operations

Cash flow from operations for the quarter ended September 30, 2005 was $93.5 million versus $38.7 million in the prior-year quarter. Year-over-year cash flow was unfavorably impacted by $39.7 million owing to the continuation of the broad-based delay in receipts from the Illinois Department of Public Aid (Illinois Medicaid). In the third quarter of 2004, a similar slowdown in cash receipts from Illinois Medicaid occurred, impacting cash flow by approximately $18 million, along with an administrative backup in cash receipts of an incremental $13 million from Medi-Cal related to the transfer of licenses for certain of our California pharmacies.

"We were extremely pleased with the strength of our cash flow during the quarter, particularly in light of the continued delays in payments from Illinois Medicaid. We are encouraged by recently announced

developments related to new financing initiatives by the State of Illinois and are hopeful they will clear-up the backlog of receivables to all Illinois healthcare providers in the near future," said Gemunder. "Despite the payment delays from Illinois Medicaid throughout most of the year, the strength and continuity of our cash flow elsewhere have allowed us to carry out our plans and deploy our capital to fund acquisitions and pay down debt."

Earnings before interest, income taxes, depreciation and amortization (EBITDA) for the third quarter of 2005, including the aforementioned special items, was $162.1 million versus $120.5 million in the same quarter of 2004. Excluding the special items, adjusted EBITDA for the 2005 quarter, was $171.0 million versus $125.6 million in the comparable 2004 quarter.

To facilitate comparisons and to enhance understanding of core operating performance, the discussion that follows includes financial measures that are adjusted from the comparable amount under Generally Accepted Accounting Principles (GAAP) to exclude the impact of the special items described elsewhere herein. For a detailed presentation of reconciling items and related definitions and components, please refer to the attached schedules or to reconciliation schedules posted on the Company's Web site at www.omnicare.com.

It should also be noted that the results of the NeighborCare, excelleRx and RxCrossroads acquisitions are included from the dates such acquisitions closed (July 28, 2005, August 12, 2005 and August 15, 2005, respectively). All three acquisitions are included in the Pharmacy Services Business segment.

Pharmacy Services Business

Omnicare's pharmacy services business generated record revenues of $1,410.7 million for the third quarter, approximately 38% higher than the $1,021.0 million reported in the comparable prior-year quarter. Adjusted operating profit in this business reached $158.2 million, 32% above the $120.0 million recorded in the third quarter of 2004. At September 30, 2005, Omnicare served long-term care facilities and other chronic care settings comprising approximately 1,441,000 beds versus approximately 1,071,000 at September 30, 2004, an increase of 35%.

*"The exceptional results in our pharmacy services business reflect the continued success of our acquisition strategy in producing strong growth in our core institutional pharmacy business while broadening our platform for future growth", said Gemunder. "Our sales growth for the quarter was enhanced significantly by the*

- 15 -

*contribution of the NeighborCare, excelleRx and RxCrossroads businesses.*

*"Strong sales growth in the institutional pharmacy business was attributable not only to the addition of NeighborCare, but also to increased acuity, the expansion of clinical and other service programs, drug price inflation and market penetration of newer branded drugs, offset, in part, by the increasing use of generic drugs."*

*       *       *

The Company's CRO business, including Omnicare Clinical Research and Clinimetrics Research Associates, Inc., generated revenues of $44.3 million on a GAAP basis for the 2005 third quarter, as compared with the prior-year quarter's revenues of $33.0 million. Included in both periods were reimbursable out-of-pocket expenses totaling $6.5 million in the 2005 period and $4.5 million in the 2004 period. Excluding these reimbursable out-of-pocket expenses, adjusted revenues of $37.8 million in the 2005 third quarter compared with revenues of $28.4 million in the 2004 third quarter. Adjusted operating profit in the 2005 third quarter was $3.8 million versus the $3.2 million earned in the comparable 2004 period. Backlog at September 30, 2005 was $258.3 million.

"Quarterly revenues and operating profit in our larger CRO business, Omnicare Clinical Research, were higher on a year-over-year basis. While the timing of the completion of certain contracts caused some volatility in revenues on a sequential basis, variable operating expenses were reduced, producing expanded margins and consistent operating profit sequentially," said Gemunder. "In addition, the momentum in Clinimetrics' business began to rebound during the quarter. New business wins and backlog were higher sequentially as were pending proposals, all of which bodes well for Clinimetrics' future growth."

Special Items

As noted above, results for the third quarter 2005 included certain special items, including a previously announced restructuring charge of approximately $8.9 million pretax ($5.6 million after tax or 5 cents per diluted share) related primarily to certain costs associated with the NeighborCare integration plan and other productivity initiatives as well as a charge to interest expense of $7.5 million pretax ($4.7 million after tax, or 4 cents per share) related to the debt extinguishment and new debt issuance costs in connection with the new financing arrangement undertaken to provide interim funding for the NeighborCare, excelleRx and RxCrossroads transactions.

The results for the third quarter of 2004 included a special charge totaling $5.2 million pretax ($3.2 million after tax or 3 cents per diluted share) in connection with certain state Medicaid audits related to prior periods, lowering gross profit by approximately $2.7 million and increasing selling, general and administrative expenses by $2.5 million.

*     *     *

Omnicare Outlook

*In commenting on the outlook for Omnicare and the industry, Gemunder said, "Ongoing trends in government reimbursement reductions, both state and federal, as well as competitive pricing pressures continue to be facts of life for our industry. We continue to address the challenges presented by pricing and reimbursement issues by broadening our business and through productivity enhancement and cost reduction programs designed to help offset these trends. Moreover, we expect the impact of reimbursement reductions from state Medicaid programs to be greatly reduced with the advent of the new Medicare Drug Benefit on January 1, 2006."*

*Under the new Medicare Part D benefit, Prescription Drug Plans, or PDPs, sponsored by commercial insurers or other risk-bearing entities approved by the Centers for Medicare and Medicaid Services (CMS) will offer a drug benefit to Medicare-eligible beneficiaries, including those dually eligible under Medicaid, which will include many residents of the skilled nursing facilities served by Omnicare.*

*"We remain highly focused on the upcoming implementation of the Medicare Drug Benefit. While bringing about sweeping change in our industry, we believe we are well-positioned to add value under the new Medicare Part D benefit.  To date, Omnicare has signed numerous agreements with Medicare Part D Plans across the United States, including a number of organizations planning to provide national coverage, as well as many agreements with regional and local plans also intending to provide the Medicare Prescription Drug Benefit beginning in 2006. The PDPs with whom we've partnered have largely recognized the specialized services required for long-term care residents, as well as Omnicare's experience and expertise in providing pharmaceutical care in this market. As the enrollment process begins, we are busy educating our long-term care facility clients and their residents on the availability and implementation of the new drug benefit," added Gemunder.*

*"Looking ahead, we are proceeding in a careful, measured way to integrate NeighborCare into our existing operations. As we have said previously, we expect the acquisition to be significantly accretive to*

*Omnicare's diluted earnings per share in 2006 and beyond. Moreover, we are excited about the expanded growth platform provided by excelleRx and RxCrossroads," said Gemunder.*

*"Overall, Omnicare's revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy - one that has allowed us to provide shareholder value in many types of industry conditions. With this, and our demonstrated ability to maintain financial strength and flexibility, we see numerous opportunities to leverage our business both through internal and external growth in the year to come."*

34.    On November 7, 2005, the Company issued a statement in response to

rumors concerning the Company's illegal practices. Defendants sought to dissuade

investors from believing the rumors circulating about the Company:

"*Omnicare's policy is to comply with all applicable federal and state laws and regulations. To the best of our knowledge, our purchases of pharmaceuticals comply with all applicable laws and regulations and are consistent with Omnicare's goal of providing appropriate pharmaceutical care cost-effectively for the seniors we serve.*"

35.    On December 15, 2005, the Company issued a press release entitled

"Omnicare Completes Offerings of $750 Million of Senior Subordinated Notes, $977.5

Million of Convertible Senior Debentures and 12,825,000 Shares of Common Stock."

The release stated in part:

Omnicare, Inc. (the "Company") today announced that it has completed its offering of 12,825,000 shares of common stock (not including the underwriters' option to purchase additional shares) at $59.72 per share, and also has completed its offerings of $225 million aggregate principal amount of 6 3/4% senior subordinated notes due 2013, $525 million aggregate principal amount of 6 7/8% senior subordinated notes due 2015 and its offering of $977.5 million aggregate principal amount of 3.25% convertible senior debentures due 2035 (including the exercise in full by the underwriters of their option to purchase additional debentures).

Lehman Brothers, J.P. Morgan and SunTrust Robinson Humphrey acted as joint book-running managers and CIBC World Markets, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the senior subordinated notes offering. J.P. Morgan, Lehman Brothers and CIBC World Markets acted as joint book-running

managers and SunTrust Robinson Humphrey, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the convertible debentures offering. Lehman Brothers, J.P. Morgan and Merrill Lynch & Co acted as joint book-running managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

36.    On January 12, 2006, the Company issued a press release entitled

"Omnicare Announces Exercise of Underwriter's Option to Purchase Additional Shares,"

which stated in part:

Omnicare, Inc. today announced that the underwriters of its previously announced common stock offering of 12,825,000 shares of common stock, which closed on December 15, 2005, have exercised their option in part to purchase an additional 850,000 shares of common stock at $59.72 per share less underwriting discounts and commissions. The sale of the additional shares is expected to close on January 17, 2006.

Lehman Brothers, J.P. Morgan and Merrill Lynch & Co acted as joint bookrunning managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

37.    On January 16, 2006, the *Cincinnati Business Courier* published an article

entitled "Omnicare subpoenaed in generic drug probe," which stated in part:

Omnicare Inc. has been subpoenaed in an investigation of generic drug distribution.

The U.S. Attorney for Massachusetts has asked for information about Omnicare's relationships with manufacturers and distributors of three pharmaceutical products, the company said in a news report.

Omnicare defended its pharmaceutical purchases, saying it complied with regulations and will cooperate in the investigation.

Covington-based Omnicare said it believes the government is investigating allegations of substitution of three generic drugs:

Substituting capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac; Giving tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and Substituting two 7.5

milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar.

In September, Johnson & Johnson had been subpoenaed for documents concerning sales and marketing of eight drugs to Omnicare.

38.    On January 17, 2006, *TheStreet.com* published an article entitled "Probe

News Punishes Omnicare Shares," which stated in part:

Omnicare is feeling some regulatory pain.

The institutional pharmacy has found itself caught up in two government probes even as it struggles to overcome major glitches associated with the new Medicare Part D drug coverage program. The company recently learned that federal and state officials have begun investigating allegations surrounding three generic drugs that it supplies to its nursing home patients. In addition, it has fielded questions from a federal prosecutor about its relationship with certain drug manufacturers.

The first probe seems to involve Omnicare directly. Based on a regulatory filing Omnicare made late Friday, the government is seeking information about the pills the company supplies to treat three common ailments. Specifically, the filing indicates, the government is questioning whether Omnicare improperly substituted two 7.5-milligram Buspirone anti-anxiety tablets for one 15-milligram tablet, Fluoxetine anti-depression tablets for capsules and Ranitidine heartburn capsules for tablets.

39.    Then on January 27, 2006, *The Cincinnati Enquirer* published an article

entitled "Omnicare Offices in Mich. Raided." The article stated:

The Michigan attorney general's office said Thursday that its agents led a raid of Omnicare Inc. offices in the Detroit suburb of Livonia and other unspecified cities in search of information it would not disclose.

"The only thing that I can confirm is that the attorney general's office is executing search warrants, but I can't give you any details because this is an ongoing investigation," said Melissia Christianson, a spokeswoman for the agency.

Omnicare already has had three publicized run-ins with law enforcement officials in 2006. Earlier this month, the company received a subpoena from the U.S. Attorney's Office in Boston for information about the sale of three generic drugs.  On Jan. 18, the Ohio attorney general's office conducted a search of an Omnicare unit in Dublin that sells equipment such as wheelchairs and walkers.

- 20 -

An Omnicare spokesman would not discuss the raid Thursday in Michigan.

"I can't confirm or comment on government investigations," spokesman Andy Brimmer said.

The attorney general's office in Michigan can bring both civil and criminal actions in that state. Christianson said no cases have been filed in connection with Thursday's raid.

40. On January 30, 2006, *Associated Press* published an article entitled

"Omnicare Shares Drop on Michigan Raid Report; Omnicare Declines Comment on

Report of Michigan Raid; Stock Falls on Report, Analyst Downgrade." The article stated

in part:

Omnicare Inc. shares fell more than 10 percent Monday following a published report of a raid at the company's offices in Livonia, Mich., and an analyst downgrade on that report.

The Cincinnati Enquirer said Friday that the Michigan attorney general's office raided Omnicare's offices in Livonia and other cities last week. The company, which provides pharmacy services for long-term care facilities, also operates pharmacies in Grand Rapids, West Branch and Escanaba, Mich., according to the newspaper.

No details were released on the nature of the search. In a statement Monday, Omnicare declined to comment on, or confirm, whether there was a review. The company said it operates within a highly regulated industry which makes it, and industry peers, subject to government reviews and inquires on a regular basis.

The Covington, Ky.-based company added its goal is "to comply with all laws and regulations."

Jerry L. Doctrow, an analyst with Stifel Nicolaus, downgraded the stock to "Hold" from "Buy" citing his concerns regarding the raid.

Doctrow reiterated his optimism about Omnicare's earnings prospects, but said he was "troubled" by news of a fourth investigation at Omnicare's offices since the beginning of the year, and was concerned about the potential for further raids.

He speculated that the raid may be part of a coordinated multistate review of Omnicare's drug pricing under state Medicaid programs.

41.    In response, Omnicare shares fell $5.09 to $49.96 in afternoon trading on the New York Stock Exchange.

42.    The true facts, which were known by each of the Defendants but concealed from the investing public during the Relevant Period, were as follows:

   a. The Company was artificially inflating its earnings by engaging in improper generic drug substitution. Specifically, the Company was substituting capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac; giving tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and substituting two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar.

   b. The Company was not in compliance with Medicare laws.

   c. The Company's strategy was *not* sound. In fact, the implementation of Medicare Part D had dramatically increased the Company's costs and increased the number of rejected Medicare claims to nearly 40%.

   d. The Company was not "well-positioned to add value under the new Medicare Part D" Plan. Rather, the Company lacked adequate staff and internal compliance controls to ensure the Company could benefit from the new plan. Instead, Part D wreaked havoc on the Company's business model, sending costs, rejection rates and receivables far higher than shareholders were led to believe.

- 22 -

## INDIVIDUAL DEFENDANTS' INSIDER STOCK SALES

43.    During the Relevant Period, Defendants Hutton, Gemunder, and Froesel sold 94,292 Omnicare shares for proceeds of $5,045,135.08.

44.    During the Relevant Period Defendant Hutton sold 89,300 Omnicare shares for proceeds of $4,758,329.20.

45.    During the Relevant Period Defendant Gemunder sold 4,102 Omnicare shares for proceeds of $235,681.40.

46.    During the Relevant Period Defendant Froesel sold 890 Omnicare shares for proceeds of $51,124.48.

47.    The Defendants insider stock sales are set forth below:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Edward L. Hutton | 09/02/2005 | 39,150 | $52.45 | $2,053,417.50 |
| | 11/08/2005 | 47,765 | $53.75 | $2,567,368.75 |
| | 12/01/2005 | 2,385 | $57.67 | $137,542.95 |
| | | **89,300** | | **$4,758,329.20** |
| Joel F. Gemunder | 11/10/2005 | 1,359 | $55.73 | $75,737.07 |
| | 01/09/2006 | 2,743 | $58.31 | $159,944.33 |
| | | **4,102** | | **$235,681.40** |
| David W. Froesel, Jr. | 11/10/2005 | 299 | $55.73 | $16,663.27 |
| | 01/09/2006 | 591 | $58.31 | $34,461.21 |
| | | **890** | | **$51,124.48** |
| **Total** | | **94,292** | | **$5,045,135.08** |

## DEMAND WOULD BE FUTILE

48.    Plaintiff brings this action derivatively in the right and for the benefit of Omnicare to redress injuries suffered and to be suffered by Omnicare as a result of the

breaches of fiduciary duty by the Individual Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

49.     Plaintiff will adequately and fairly represent the interests of Omnicare and its shareholders in enforcing and prosecuting its rights.

50.     Plaintiff is an owner of Omnicare common stock and was an owner of Omnicare common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

51.     Derivative Plaintiff has not made a demand on the Board of Directors to bring these causes of action because such a demand would be futile. At the time these derivative actions were commenced, the Board of Directors consisted of nine members: Edward L. Hutton, Joel F. Gemunder, John T. Crotty, Charles H. Erhart, Jr., David W. Froesel, Jr., Sandra E. Laney, Andrea R. Lindell, John H. Timoney and Amy Wallman. As detailed below, each of the Directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

52.     All of these Directors face a substantial likelihood of liability in this action because of their failure, as Directors, to assure that a reliable system of financial controls was in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight. These Directors either knew or should have known that

- 24 -

violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company.

## THE DIRECTORS OF THE COMPANY LACK INDEPENDENCE

53.    Director Defendant Hutton held an executive position as Chairman of the Company from 1981 until May 2003.  As a former executive of the Company, Hutton lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

54.    Director Defendant Gemunder, as the Company's current President and CEO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

55.    Director Defendant Froesel, as the Company's current Senior Vice President and CFO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

56.    The spouse of Director Defendant Laney is the Vice President – Management information Systems of the Company.  As such, Defendant Laney lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

57.    The Proxy Statement filed by the Company on April 13, 2005, states that Director Defendants Hutton, Gemunder, Froesel and Laney are not independent according to NYSE standards.

58.    Director Defendants Hutton, Gemunder, Erhart, Laney, and Timoney are all also members of the Board of Directors of Chemed Corporation. Director Defendants Hutton, Gemunder and Laney are also former officers of Chemed. Because of these overlapping board memberships, Director Defendants Hutton, Gemunder, Erhart, Laney, and Timoney lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

59.    Should Director Defendants decide to bring claims against themselves, that would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

60.    In addition, demand would be a futile and useless for the additional following reasons:

a. Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b. The Director Defendants of Omnicare, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Omnicare's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c. In order to bring this suit, a majority of the Directors of Omnicare would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

    d.  The acts complained of constitute violations of the fiduciary duties owed by Omnicare's officers and directors and these acts are incapable of ratification; and

    e.  Omnicare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Omnicare any part of the damages Omnicare suffered and will suffer thereby;

61.    Plaintiff has not made any demand on the shareholders of Omnicare to institute this action since demand would be a futile and useless act for the following reasons:

    a.  Omnicare is a publicly held company with approximately 106.58 million shares outstanding, and thousands of shareholders;

    b.  Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

62.    Omnicare has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.   Such expenditures will include, but are not limited to:

    a.  Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

    b.  Cost incurred in relation to the current inquiry by the U.S. Attorneys office and the Michigan Attorney General's office.

### FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

63.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

64.    The Individual Defendants owed and owe Omnicare fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Omnicare the highest obligation of good faith, fair dealing, loyalty and due care.

65.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

66.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

67.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Omnicare has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

68.    Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

### SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

69.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

70.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Omnicare, for which they are legally responsible.

71.   As a direct and proximate result of the Individual Defendants' abuse of control, Omnicare has sustained significant damages.

72.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

73.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

74.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

75.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Omnicare in a manner consistent with the operations of a publicly held corporation.

76.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Omnicare has sustained significant damages in excess of millions of dollars.

77.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

78.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

80.     As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Omnicare to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

81.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

82.     Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Director Defendants
### for Unjust Enrichment

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

84.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Omnicare.

85.     Plaintiff, as shareholder and representative of Omnicare, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits,

benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against Defendants Hutton, Gemunder, and Froesel for Breach of Fiduciary Duties, for Insider Selling and for Misappropriation of Information

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

87.     At the time of the stock sales set forth herein by Defendants Hutton, Gemunder, and Froesel, they knew the information described above and sold Omnicare common stock on the basis of such information.

88.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Defendants Hutton, Gemunder, and Froesel used for their own benefit when they sold Omnicare common stock.

89.     The sale of Omnicare common stock by Defendants Hutton, Gemunder, and Froesel while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

90.     Since the use of the Company's proprietary information for their own gain constitutes a breach of fiduciary duties by Defendants Hutton, Gemunder, and Froesel, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.    Awarding to Omnicare restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 23, 2006

Respectfully Submitted,

*[signature]*

Bradford P. Bollmann
SCHILLER OSBOURN & BARNES, PLLC
1600 One Riverfront Plaza
401 West Main Street
Louisville, Kentucky  40202
(502) 583-4777
bpb@soblegal.com
*Local Counsel for Plaintiff*

AND

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone:  (405) 235-1560
Fax:  (405) 239-2112
wfederman@aol.com
*Lead Counsel for Plaintiff*

## VERIFICATION

I, _____ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Omincare, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Omincare, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

02/15/06
Date

(Signature of Investor)