**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

| | | |
|---|---|---|
| TIM IRWIN, Derivatively and on Behalf of Nominal Defendant, OMNICARE, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2-06-CV-62 |
| JOEL F. GEMUNDER,  DAVID W. FROESEL, JR., CHERYL D. HODGES, EDWARD L. HUTTON, JOHN T. CROTTY, CHARLES H. ERHART, JR., SANDRA E. LANEY, ANDREA R. LINDELL, JOHN H. TIMONEY and AMY WALLMAN , | ) ) ) ) ) ) ) ) ) | HON. WILLIAM O. BERTELSMAN<br><br><br><br>Electronically Filed |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| OMNICARE, INC., | ) ) | JURY TRIAL DEMANDED |
| Nominal Defendant | ) | |

## FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Tim Irwin ("Plaintiff"), derivatively and on behalf of Nominal Defendant Omnicare, Inc. by and through his undersigned attorneys, and for his Complaint against Defendants herein, alleges the following based upon personal knowledge of the Plaintiff, and on information and belief as to all other matters, based upon*, inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding Omnicare, Inc. (hereafter "Omnicare" or the "Company") and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.     This is a shareholder derivative action brought by Plaintiff and shareholders of Omnicare against certain current or former officers and directors of Omnicare seeking to remedy the Individual Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from August 3, 2005 through the present, (the "Relevant Period") and that have caused substantial losses to the Company. [1]

2.     Omnicare is the nation's largest provider of pharmaceutical care for the elderly, generating net sales for the Pharmacy Services segment of approximately $5.3 billion in 2005, up 28.5% from $4.1 billion in 2004. The Company operates in two business segments, Pharmacy Services and Contract Research Organization Services ("CRO Services"). This complaint arises out of Omnicare's Pharmacy Services which accounted for 97% of its revenue in 2005, 96% of IT revenue during 2Q 2005 and 97% of its revenue during 3Q 2005.

3.     Omnicare's Pharmacy Services section provided pharmacy care to an estimated 1,452,000 beds in 47 states, the District of Columbia and Canada during the

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between August 3, 2005 and January 27, 2006, the Relevant Period continues through this day instead of ceasing on January 27, 2006, the day before the public became aware of the wrongdoings at the Company.

Relevant Period. These services consist of distribution of pharmaceuticals and related pharmacy consulting. In addition, Pharmacy Services purchases, repackages and dispenses pharmaceuticals, both prescription and nonprescription, to patients in long-term care facilities ("LTC facilities") for administration by the facilities nursing staff

4.      On August 3, 2005, in a press release touting that "***Omnicare's institutional pharmacy business generated record revenues***" for 2Q 2005, CEO Gemunder stated, "***[o]ur sales once again hit record highs, and our operating margins improved on a sequential basis, reflecting the growing benefits of our cost reduction and productivity enhancement initiatives***." On November 2, 2005, in another press release, Omnicare declared that its "***pharmacy services business generated record revenues***" again for the 3Q 2005 and Gemunder stated, "'***sales reached a record high and our adjusted third quarter earnings per share were well in line with expectations***.'" By all accounts, Omnicare looked to be a healthy growing business poised to maintain, and indeed surpass, its previous growth expectations in the pharmaceutical industry. The press releases issued by Individual Defendants portrayed a robust company that was continuing to grow through acquisitions, expansion of their programs and market penetration of newer branded drugs. In truth, however, while the Individual Defendants praised the Company's financial well being, they were in fact engaged in improper revenue recognition and overvaluation of receivables and inventories in violation of Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") guidelines.

5.      Gemunder stated that the Company's "***institutional pharmacy business generated record revenues***," while knowing that Omnicare was embroiled in a scheme

to improperly recognize false revenues. While stating that the Company's sales had reached "**record highs**" and generated "**record revenues**," Individual Defendants were in fact improperly recording revenues for products that were never delivered and services never rendered. Prior to and during the Relevant Period, Individual Defendants submitted claims and invoices to LTC facilities and patients for prescriptions that were never ordered or simply never provided. In some circumstances, Individual Defendants provided products and services, but fraudulently submitted multiple claims and invoices for these products and services.   Individual Defendants were certainly aware of this practice. For example, Omnicare had the ability to, and did, monitor such fictitious claims via internally generated reports referred to as Duplicate Claims Reports and Duplicate Pharmacy Reports. Such reports detailed duplicate prescriptions and services on both the medical and pharmacy segments of Omnicare's fraudulent business. Omnicare went so far as to monitor these false claims by member number, month and date of service. Individual Defendants relied on these false and repetitive claims to bolster the Company's net income, earnings per share ("EPS") and financial position.

6.    Individual Defendants also fabricated a scheme to inflate the Company's earnings and financial position by ignoring the most basic theories of accounting which require doubtful receivables to be reserved for and uncollectible receivables to be written-off as charges to earnings during the applicable reporting period. For example, Individual Defendants allowed obvious uncollectible receivables to remain on their balance sheet with no corresponding reserves or write-off of uncollectible accounts. Moreover, it was management's decision not to adequately reserve for doubtful receivables and not to write-off known uncollectible receivables.  It was estimated that

up to 60% of Omnicare's receivables were worthless, which equates to over $625 million and $850 million in bogus receivables for the quarters ended June 30, 2005 and September 30, 2005, respectively. Had Individual Defendants properly accounted for Omnicare's uncollectible accounts and current sales transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated.

7.      Additionally, Individual Defendants improperly recognized revenue on these transactions knowing collections were not reasonably assured.  Had Omnicare properly accounted for these transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated.

8.      The Individual Defendants also fraudulently overvalued Omnicare's inventory by not recording inventory at the lower of their cost or market value and intentionally failing to reserve for and write-off expired and obsolete products from their balance sheet as a charge to earnings. According to a former employee, drugs that were returned to their facilities were commingled with similar drugs in other vials. In many instances the returned drugs had expired and were worthless. Additionally, pharmacy personnel received products that came back in the form of blister packs. Blister packs are plastic sealed packages which contain various pharmaceutical drugs, which, in certain instances, may be patient specific. Pharmacy personnel would open the returned blister packs and put the individual pills in generic vials that included pills from other lots and with varying expiration dates. It was noted that many of the vials, as many as 150 in one location, lacked expiration dates, facilitating the commingling of expired and possibly incompatible drugs.  Omnicare was required to destroy the expired products and immediately write them off of their balance sheets. By ignoring these

requirements, Individual Defendants were able to inflate their net income and EPS prior to and during the Relevant Period.

9.      In the August 3, 2005 and November 2, 2005 press releases Individual Defendants also partially attribute their seemingly stellar 2Q 2005 and 3Q 2005 revenues to "*[t]he continued execution of our acquisition strategy*" and "*the continued success of our acquisition strategy in producing strong growth in our core institutional pharmacy business*." In fact, on each of the follow-up conference calls, Hodges reiterated the Company's financial strength through use of a numerical bed metric which calculated Omnicare's revenue via the beds it was serving in the LTC facilities. The Individual Defendants used this bed metric to laud Omnicare's revenue increase stating, "*[o]ur revenue per bed for the quarter was $982, up 6% over the prior year quarter and 2%, sequentially*" on August 3, 2005 and "*[o]ur revenue per bed for the quarter rose to $1,083 per bed on an adjusted basis, up 10% sequentially, and 13% year-over-year*" on November 2, 2005, leading shareholders to believe that Omnicare was acquiring new business.

10.     Just prior to the Relevant Period, Omnicare acquired its largest competitor, NeighborCare, Inc. ("NeighborCare"), as well as excelleRx, Inc. ("excelleRx") and RxCrossroads LLC ("RxCrossroads") during the Relevant Period, to become the largest geriatric pharmaceutical services company in the nation. The July 28, 2005 acquisition of NeighborCare added 295,000 beds in 34 states and the District of Columbia. In addition, the excelleRx acquisition netted Omnicare with 400 hospice programs and 48,000 additional beds in 46 states. The last acquisition, RxCrossroads provided Omnicare with specialty distribution, product support and mail order pharmacy

services. The Individual Defendants caused Omnicare to make the acquisitions in order to hide Omnicare's failing business performance as illustrated through its declining bed counts. Individual Defendants relied on these acquisitions to replace revenue and beds being lost in the Pharmacy Services business. In acquiring these three companies, the Individual Defendants caused Omnicare to spend $2.0 billion in cash consideration and an additional $400 million in acquired debt and transaction costs just prior to and during the Relevant Period. Omnicare financed the capital expenditures with proceeds from a $3.4 billion Credit Agreement ("Credit Agreement") using its bed count as a metric to illustrate sales growth, and portray itself as a healthy company. The three acquisitions portrayed the Company as obtaining huge sales growth as the acquired pharmacies produced an impressive bed count that totaled over 340,000 beds. These additional beds brought Omnicare's total bed count to 1.45 million, a 31% increase, and allowed the Company to conceal the fact that it was losing on average 10,000 beds a month for high drug costs and poor service. The new business acquired only recuperated 60-70% of the beds lost, but allowed the Company to hide the fact that it was losing beds as fast as it was gaining them.

11.    The Individual Defendants utilized Omnicare's artificially inflated stock price to secure over $2.5 billion from a public offering on December 15, 2005 and January 17, 2006. The Company sold 13,700,000 shares of its stock at $59.72 per share, issued $750 million of senior subordinated notes and $977.5 million of convertible senior debentures notes enabling the Individual Defendants to pay off the Credit Agreement, used to make the acquisitions, and keep up the appearance of strong growth.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

12.     In addition to the false and misleading statements concerning the Company's finances, on August 8, 2005, the Individual Defendants made false assurances that Omnicare "'**abides by state laws and all applicable board of pharmacy regulations**'" in *TheStreet.com* regarding its practices concerning unused drugs. In truth, however, the Company was actively engaged in the illegal recycling of returned unused drugs from blister packs. Further, every drug package contains the drug's pedigree, which consists of the drug's manufacturer code and expiration date. Specifically, Omnicare's policy consisted of improperly taking returned drugs, removing them from the blister packs, placing them in vials along with the same type of drug, repackaging the vials and reselling the drugs to LTC facility residents. Omnicare physicians participated in this practice with a complete disregard for the drug's pedigree or patients' health. The drug's pedigree was not memorialized when the physicians placed drugs from multiple sources in the same vials. As a result, many vials contained generic drugs from different manufacturers and with different expiration dates. While all of the drugs were of the same type, anyone receiving drugs from these vials would not know who made the drug, a potential problem if the drug was recalled, nor would they know when the drug expired.

13.     On November 7, 2005, the Company made yet another false statement regarding their compliance with federal and state laws and regulations for Medicaid and Medicare. Omnicare stated:

> "**Omnicare's policy is to comply with all applicable federal and state laws and regulations. To the best of our knowledge, our purchases of pharmaceuticals comply with all applicable laws and regulations and are consistent with Omnicare's goal of providing appropriate pharmaceutical care cost-effectively for the seniors we serve.**"

This was untrue as the Individual Defendants were causing Omnicare to engage in the illegal practice of drug substitution, which was hidden under Omnicare's therapeutic interchanges program. In fact, CFO Froesel actively encouraged the practice.

14.     Under the therapeutic interchanges plan, Froesel would order a regional or particular subsidiary pharmacy, at least twice a quarter, to engage in a "health management initiative" by which the Company would take steps to substitute higher priced "brand name" drugs for the lower priced drugs then currently used, thereby raising revenue. Froesel directed Omnicare employees to create clinical case studies to support the proposition that the higher priced name brand pharmaceuticals worked better then the less expensive generic brands. Omnicare employees then gave these studies to physicians who unwittingly signed off on these spurious studies and, in this way, physicians put a medical "seal of approval" of sorts that justified Omnicare's therapeutic interchange program. The employees would analyze Omnicare patient databases to review each patient's attending/prescribing physician, the LTC facility housing the patient, the patient's family and medical information, including references to allergies, and vulnerability to side effects. This data would be used to write the therapeutic interchange letter which essentially made the argument that it was in the patient's best interest to use the more expensive name brand pharmaceutical and thus justify the drug substitution. The net effect of the letter was to persuade the prescribing physician, LTC facility and family members to recommend the substitution to the patient. As a result, the higher priced drugs provided a revenue boost for Omnicare, without granting any additional benefit to the patient.

15.     The therapeutic interchange program necessitated approval by a physician to implement drug substitution. However, even without approval, Omnicare was not deterred from illegally substituting drugs. Omnicare consistently made illegal drug substitutions which included: substituting capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac; giving tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and substituting two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar. These substitutions boosted revenues for Omnicare, improving its business model while potentially endangering patients' lives.

16.     While Omnicare continued making false and misleading statements about the Company's financial strength and growth, it was also struggling with the transition of an extensive overhaul to the Medicare program, known as Medicare Part D ("Part D"). In December 2003, Congress enacted the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"). This act created Part D, which was a major expansion of Medicare. Under Part D, Medicare beneficiaries could enroll in prescription drug plans ("PDPs") offered by private entities, which provide insurance coverage for prescription drugs. As a result, Omnicare entered into contracts with at least 112 PDPs throughout the nation to supply the needed drugs. In this way, the PDPs, acting as insurance carriers, would compensate Omnicare for providing the needed pharmaceuticals to the Part D beneficiaries. The PDPs would then seek reimbursement from The Center for Medicare and Medicaid Services ("CMS") at an 8% markup. Omnicare thus bought the drugs at a lower cost and the PDPs were afforded a markup at the expense of Medicare and Medicaid.

17.     Throughout the Relevant Period, Individual Defendants lauded Omnicare's ability to implement Part D with ease stating, as early as August 3, 2005, that they believed the Company was "***well-positioned to add value under the new Medicare Part D benefit.***" However, Individual Defendants failed to monitor key developments with the CMS implementation of Part D. For example, Omnicare never discovered that the online beneficiary database, which was essential for the successful implementation of the long awaited Part D, was incomplete. The beneficiary database is used by pharmacies to submit enrollment eligibility queries for Medicare beneficiaries and was incomplete at the outset of the program. Omnicare also stated in the August 3, 2005 press release that it would "***monitor developments and continue to ready [Omnicare] as the year progresse[d]***" in conjunction with Part D, however, Omnicare was unaware of the chaos ensuing regarding the national database. While NBC Health ran the national database on behalf of CMS, Omnicare should have known of the database's deficiencies if in fact Omnicare was actually monitoring developments in the implementation of Part D. Omnicare failed to check the database's completeness prior to the Part D transition, and thus the transition was a complete failure with 40% of Part D claims being rejected.

18.     During the first week of January 2006, the database was incomplete with respect to 50% of the beneficiaries. As a result, Omnicare could not figure out which patients were eligible for benefits or which PDPs should be billed in conjunction with benefits received. These deficiencies created more work for the pharmacists. Prior to Part D, the pharmacist would have been able to properly bill by merely accessing the insurance carrier's database, a process which would take mere seconds. Upon Part D

implementation, however, this quick process was substantially changed because the Part D databases were incomplete and the pharmacist was unable to find many of the patients in this incomplete database. This resulted in numerous inefficiencies. The pharmacist now had to call every PDP contracted with Omnicare to verify coverage and access to medications, a process which initially took several hours to complete due to the immense number of beneficiaries being serviced by Part D and caught in this billing quagmire, and by the end of the Relevant Period was still taking as long as 20-30 minutes.

19.     Compounding the Part D debacle, the Individual Defendants did not properly work with and educate the PDPs to the nuances of pharmacy care prior to the transition into Part D even though they had stated on August 3, 2005:

> *We have been extremely busy in the last couple of months,  working with potential PDP's to familiarize them about the specialized services required and the nuances of providing pharmacy services to long-term care residents and negotiating agreements for out participation in their pharmacy networks to serve the long-term care market.*

For example, the PDPs were required to pay for drugs administered by a nurse from an emergency supply after hours (first dose administration) without prior approval even if the particular drug being administered is not on the PDP's formulary list. This was not being done. Another nuance about which the PDPs were uninformed is the situation in which a patient is admitted to a nursing home and then goes back to the hospital. While the patient is in the hospital, the old drugs in the nursing home are required to be destroyed. If the patient is readmitted, within two days, to the nursing home and requires the same prescription, the PDP is required to pay for a full drug regimen. The Company failed to inform the PDPs of these requirements during the Part D transition.

Thus, the PDPs were hopelessly confused when they failed to follow transition guidelines which required access to any drug for dual eligible state and federal recipients for at least the first 30 days. While Omnicare assured the investing public that it was "***working with potential PDPs***" to familiarize them with the nuances and details of Part D to aid in its implementation, in fact it was disregarding those assurances and leaving the PDPs to flounder.

20.     The Individual Defendants failed to properly train and educate Omnicare's own employees in the implementation of Part D. Instead, implementation of Part D was left to each pharmacy. There are numerous illustrations of Omnicare employees being inadequately trained on Part D, the training sometimes occurring for only half a day. In other Omnicare pharmacies this lackadaisical training approach meant meeting in the middle of the month in January and April, well after the new plan took effect, rendering the training meaningless. The end result of this ineffective training was that the employees did not know how to handle Part D. Many employees were simply told about Part D's existence and that there would be more work coming in but were given no further explanation.  To make matters worse, there was no consistency of information in what Omnicare employees were being told. On a particular day an Omnicare employee might be told one thing regarding Part D implementation and then completely different information would be disseminated on another day.  This created an environment of confusion.

21.     In the midst of this chaotic environment, Gemunder lauded Omnicare's experience with billing third parties intimating that Omnicare would have no problem properly billing the third party PDPs. However, at the outset of Part D's implementation,

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

the Company was unable to bill as many as 40% of the claims. Instead, Omnicare's pharmacists were forced to call, and wait on hold, with every PDP until they were able to locate the specific PDP covering the specific Medicare beneficiary. This resulted in various inefficiencies, among them, ineffective time management and claims processing.

22.    The Individual Defendants' lack of adequate internal controls to properly implement Part D was a colossal failure resulting in rejection of up to 40% of claims in addition to a high level of incomplete and inadequate prescription reimbursement. As described in ¶¶18-19, Omnicare had trouble verifying patient eligibility and drug pre-authorization. Omnicare suffered numerous billing errors, including determining which PDP to bill, and sorting out demands for co-pays for patients who should not have had any co-pays as they were dually eligible for state and federal aid.  Consequently, the Company was forced to pay an additional $9.8 million in labor alone for the 1Q 2006 to cover overtime, billing issues and other associated cascading costs such as extra deliveries to nursing homes due to delays in obtaining drug approvals.

23.    While the Individual Defendants were balancing Omnicare's financial shenanigans, misleading investors about its growth and the work it was doing to implement Part D, and violating state and federal laws and regulations, on January 13, 2006, the Massachusetts U.S. Attorney issued a subpoena regarding Omnicare's drug substitutions. The Company publicly acknowledged in both a *Reuters News* article entitled, "Omnicare says gets subpoena from U.S. Attorney," and Form 8-K filed with the SEC on January 13, 2006, that the purpose of the investigation was for the above mentioned drug substitutions. To make matters worse for Omnicare, the Company was

raided less than a week later on January 19, 2006, when the Ohio Attorney General searched the Dublin, Ohio site for evidence of Medicaid fraud. Finally, on January 27, 2006, agents from Michigan's Attorney General's Office conducted a raid at Omnicare offices in the Detroit suburb of Livonia. While the reasons were not disclosed for the last raid, the third investigation in less than a month illustrates Omnicare's brazen flouting of federal and state laws and regulations. This raid was the third investigation in two weeks by federal and state officials.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

25.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

26.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Omnicare maintains its corporate headquarters in this District.  Further, Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

27.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States

mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

28.     Plaintiff, Tim Irwin, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Omnicare.  Plaintiff is a citizen of the State of North Dakota.

29.     Nominal Defendant Omnicare is a Delaware corporation with its principal place of business located at 100 E. Rivercenter Blvd., Suite 1600, Covington, Kentucky 41101.  Omnicare provides pharmaceutical care for elderly people primarily in the United States and Canada. The Company operates through two segments, Pharmacy Services and Contract Research Organization Services.

30.     Defendant Joel F. Gemunder ("Gemunder") is a citizen of the Commonwealth of Kentucky.  He is Chief Executive Officer, President and a director of Omnicare. During the Relevant Period, Gemunder assisted the Company in selling more than $2.5 billion worth of Omnicare securities.  In addition, Gemunder received bonuses, restricted stock awards, and other compensation worth $15,790,218; 424,350 options of stock, and a salary of $1,513,667 in 2005. In aggregate, defendant Gemunder' restricted stock award totals $65,890,890. Defendant Gemunder prepared and signed false and misleading For 10-Q financial reports and related Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") certifications filed with the SEC during the Relevant Period and, with Defendants Froesel and Hodges, represented himself to analysts, the media and investors as the person most knowledgeable at the Company regarding Omnicare's business and finances.

31.     Defendant David W. Froesel, Jr. ("Froesel") is a citizen of the Commonwealth of Kentucky.  He is the Chief Financial Officer, Senior Vice President and a director of Omnicare. During the Relevant Period, Froesel assisted the Company in selling more than $2.5 billion worth of Omnicare securities.  In addition, Froesel received bonuses, restricted stock awards, and other compensation worth $2,231,202; 77,000 options of stock, and a salary of $447,000 in 2005. In aggregate, defendant Froesel' restricted stock award totals $13,779,205. Defendant Froesel prepared and signed false and misleading For 10-Q financial reports and related Sarbanes-Oxley Act certifications filed with the SEC during the Relevant Period and, with Defendants Gemunder and Hodges, represented himself to analysts, the media and investors as the person most knowledgeable at the Company regarding Omnicare's business and finances.

32.     Defendant Cheryl D. Hodges is a citizen of the Commonwealth of Kentucky.  She is the Secretary and Senior Vice President of Omnicare. During the Relevant Period, Hodges assisted the Company in selling more than $2.5 billion worth of Omnicare securities. In addition, Hodges received bonuses, restricted stock award, and other compensation worth $1,848,935; 66,656 options of stock, and a salary of $359,167 in 2005. In aggregate, defendant Hodges' restricted stock award totals $11,717,855. Defendant Hodges, with Defendants Gemunder and Froesel, represented herself to analysts, the media and investors as the person most knowledgeable at the Company regarding Omnicare's business and finances.

33.     Defendant Edward L. Hutton ("Hutton") is a citizen of the State of Ohio. He has been a member of Omnicare's Board of Directors since 1981.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

34.     Defendant John T. Crotty ("Crotty") is a citizen of the Commonwealth of Virginia.  He has been a member of Omnicare's Board of Directors since 2004.

35.     Defendant Charles H. Erhart, Jr. ("Erhart") is a citizen of the State of New York.  He has been a member of Omnicare's Board of Directors since 1981.

36.     Defendant Sandra E. Laney ("Laney") is a citizen of the State of Ohio. She has been a member of Omnicare's Board of Directors since 1987.

37.     Defendant Andrea R. Lindell ("Lindell") is a citizen of the State of Ohio. She has been a member of Omnicare's Board of Directors since 1992.

38.     Defendant John H. Timoney ("Timoney") is a citizen of the Commonwealth of Kentucky.  He has been a member of Omnicare's Board of Directors since 2000.

39.     Defendant Amy Wallman ("Wallman") is a citizen of the State of Florida. She has been a member of Omnicare's Board of Directors since 2004.

40.     The individuals named as defendants in ¶¶30-39 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Omnicare's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

41.     In addition to the above-described involvement, each Individual Defendant had knowledge of Omnicare's problems and was motivated to conceal such problems. Froesel, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing Omnicare's forecasted and actual growth were prepared by the finance department under Froesel's direction. Defendant Gemunder, as CEO, was responsible for the financial results and press releases issued by the Company.

42.     Each Individual Defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him/her about Omnicare. Individual Defendants' fraudulent scheme and course of business (i) deceived the shareholders regarding Omnicare's prospects and business; (ii) allowed Individual Defendants to obtain larger bonuses which were directly tied to the performance of Omnicare; and (iii) allowed Individual Defendants to complete offerings of $2.5 billion worth of Omnicare securities.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act

in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

        a. exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

        b. exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

        c. exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

        d. when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

46.    The Individual Defendants, particularly the Officers and members of the Board of Directors' Audit Committee, were responsible for maintaining and establishing

adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

     a.  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

     b.  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

          i.  transactions are executed in accordance with management's general of specific authorization;

         ii.  transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

47. Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

48. According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is

operating as intended and that it is modified as appropriate for changes in conditions.

## SUBSTANTIVE ALLEGATIONS

49.     Omnicare provides pharmaceutical care for elderly people primarily in the United States and Canada. The Company operates through two segments, Pharmacy Services and Contract Research Organization Services.

50.     By Fall 2005, investors were becoming increasingly concerned about the Company's transition to Medicare Part D (effective January 1, 2006) and volume-based rebates that Omnicare earned from pharmaceutical manufacturers. Rumors relating to the Company's lack of preparedness for the program were downplayed by Individual Defendants' rosy projections.

51.     In truth, the implementation of the Medicare Part D program was more challenging than Individual Defendants revealed and was negatively impacting the Company's future earnings ability, and the Company was struggling to overcome major glitches associated with the new program. In addition, the Individual Defendants had learned that federal and state officials had begun investigating allegations surrounding three generic drugs that Omnicare supplied to its nursing home patients and was fielding questions from a federal prosecutor about its relationship with certain drug manufacturers.

52.     The first probe involved Omnicare directly. Based on a regulatory filing, the government sought information about the pills the Company supplied to treat three common ailments. Specifically, the government questioned whether Omnicare improperly substituted two 7.5-milligram Buspirone anti-anxiety tablets for one 15-

milligram tablet, Fluoxetine anti-depression tablets for capsules and Ranitidine heartburn capsules for tablets.

53.     Omnicare had been under fire for executing similar switches in the past. Notably, in 2004, Omnicare paid a $1 million fine for changes involving a single drug – Ranitidine – in the state of Maine. The Company allegedly switched patients from Ranitidine tablets costing $15.10 a month to Ranitidine capsules costing $82.77 a month instead. When announcing the settlement in mid-2004, Maine Attorney General Steven Rowe said the drug switches were initiated specifically to increase revenue to Omnicare of Maine. He added, "The so-called 'Ranitidine Initiative' at Omnicare was developed to lessen the impact of a June 2000 federal capping of the Medicaid reimbursement rate for Ranitidine tablets. The reimbursement rate for capsules was not capped."  Prior to the reimbursement change, Rowe's office stated, less than 5% of Omnicare of Maine patients who took Ranitidine received the capsule form. But after the change, the office said, that number rocketed to 95%. "I have been outraged by this case all along," Rowe said at the time. As part of the 2004 settlement, Omnicare of Maine agreed to "remain under constant monitoring by its parent company's compliance officer."

54.     Just prior to the Relevant Period, on July 28, 2005, Omnicare issued a press release over the *Business Wire*, entitled "Omnicare Completes Acquisition of NeighborCare," announcing the Company's acquisition of its closest competitor.

55.     On August 3, 2005, the Company issued a press release entitled "Omnicare Reports Second Quarter 2005 Results," which stated in part:

> Commenting on the results for the quarter, Joel F. Gemunder, Omnicare's president and chief executive officer, said, "***The second quarter was one***

*of the most important periods in Omnicare's history, highlighted by the continued solid financial performance of our business*, as well as the significant progress we made toward acquiring NeighborCare, RxCrossroads and excelleRx -- three major transactions that we believe will transform our company and provide us with *a solid platform for future growth. Our sales once again hit record highs, and our operating margins improved on a sequential basis, reflecting the growing benefits of our cost reduction and productivity enhancement initiatives*. As a result, our adjusted second quarter earnings per share were in line with our expectations and consensus estimates."

\*     \*     \*

*"The continued execution of our acquisition strategy is driving strong sales growth in our pharmacy business, and we will see additional growth in coming quarters as we begin integrating NeighborCare's business into our operations,"* said Gemunder. *"Sales growth is also being aided by year-over-year increases in occupancy and acuity in many areas, the expansion of our clinical and other service programs, drug price inflation and market penetration of newer branded drugs, offset, in part, by the increasing use of generic drugs.*

"We are pleased that our sales growth was achieved despite the ongoing trends in government reimbursement reductions, both state and federal, as well as intense competitive pricing pressures throughout the industry. *The productivity enhancement and cost reduction programs we initiated over the past year have helped to partially offset these trends and improve our operating margins on a sequential basis*. Additionally, our performance under a previously announced disease management demonstration project provided an anticipated benefit of approximately $4 million, representing our annual medication management performance payment. Annual medication management payments under this project are expected to continue over at least the next two years. We continue to look toward additional growth opportunities in the disease management arena that utilize our core clinical strengths and distribution assets."

\*     \*     \*

56.     Further, on the same day, Hodges, in a transcribed conference call, reiterated Omnicare's financials through its bed count metric stating, "*[o]ur revenue per*

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

*bed for the quarter was $982, up 6% over the prior year quarter and 2%, sequentially*."

57.     On August 9, 2005, the Individual Defendants filed Omnicare's Form 10-Q with the SEC for 2Q 2005. The Company's Form 10-Q was signed by Defendants Gemunder and Froesel and affirmed the previously announced total revenues and financial results, stating: "Omnicare's Pharmacy Services segment recorded net sales of $1,073.2 million for the three months ended June 30, 2005, exceeding the 2004 amount of $976.8 million by $96.4 million, or 9.9%." The Form 10-Q stated:

> [S]ales growth for the three and six months ended June 30, 2005 continues to be driven largely by ongoing execution of the Company's acquisition strategy along with improved year-over-year occupancy and acuity in many areas, the expansion of the Company's clinical and other service programs, drug price inflation and the market penetration of newer branded drugs targeted at the diseases of the elderly, which often carry higher prices, but are significantly more effective in reducing overall healthcare costs than those they replace.

58.     Moreover, the Company's Form 10-Q also contained certifications executed and submitted by Defendants Gemunder and Froesel pursuant to §§302 and 906 of the Sarbanes-Oxley Act, which purported to confirm the veracity of Omnicare's financial statements, substantively as follows:

> 1.      I have reviewed this report on Form 10-Q of the Company;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

4.     The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors:

(a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

*          *          *

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

1.      The Quarterly Report on Form 10-Q of the Company for the period ended June 30, 2005 (the "Periodic Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

2.      The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

59.     Later, on September 8, 2005, *TheStreet.com* published an article entitled "Omnicare's Recycling Headache," discussing drugs unused by nursing home patients mishandled before they were repackaged and sold. The article cited Omnicare stating it "'***abides by state laws and all applicable board pharmacy regulations***'" when relating to unused drugs.

60.     The Individual Defendants' statements regarding the Company's 2Q 2005 financial results, revenue growth and compliance with federal and state laws and regulations on August 3, 2005, August 9, 2005 and September 9, 2005 were materially false and misleading when made. Individual Defendants knew or recklessly disregarded, but failed to disclose the following:

a. As detailed in ¶¶124-131, the Individual Defendants fraudulently recognized revenues. The Company improperly recorded sales for which the earnings process was not complete, persuasive evidence of arrangements did not exist, delivery did not occur and collectibility was not reasonably assured.

i. Individual Defendants improperly recorded revenues for products that were never delivered and for services that were never rendered to LTC facility residents;

    ii.  Individual Defendants submitted claims and invoices to LTC facility residents for prescriptions that were never ordered or for which the prescriptions were never provided to the LTC facilities or patients;

    iii.  Individual Defendants submitted claims for services that were never rendered to LTC facility residents; and

    iv.  In certain circumstances, Individual Defendants did provide products and render services, but continued to submit multiple claims and invoices for these products and services. According to CW1[2], Omnicare had the ability to, and did, monitor such fictitious claims via internally generated reports referred to as Duplicate Claims Reports and Duplicate Pharmacy Reports. Such reports detailed duplicate prescriptions and services on both the medical and pharmacy side of Omnicare's fraudulent business. Omnicare went as far as to monitor these bogus claims by member number, month and date of service.

b.  As detailed in ¶¶137-142, the Individual Defendants fraudulently overvalued Omnicare's inventory. The Company overvalued its inventory by not recording inventory at the lower of their cost or market value and intentionally failing to reserve for and write-off expired and obsolete products from their balance sheet as a charge to expenses;

---

[2] Recently, a Consolidated Amended Complaint for Violation of the Federal Securities Laws was filed in the Securities Class Action (Case No. 06-CV-26). This Consolidated Amended Complaint made use of information provided by Confidential Sources obtained by the Securities Class Action Plaintiff's counsel. The factual allegations provided by Confidential Sources as alleged herein are derived from the Securities Class Action Consolidated Amended Complaint.

    I:\OmnicareInc\Pleadings\ComplaintAmended.doc

        i.  According to CW2, who worked at Omnicare as a Purchasing Manager, drugs that were returned to their facilities were commingled with similar drugs in other vials. However, in many instances the returned drugs had expired and were worthless. Additionally, pharmacy personnel received products that came back in the form of blister packs. Pharmacy personnel would open the returned blister packs and put the individual pills in generic vials that included pills from other lots and with varying expiration dates. CW2 noted that many of the vials, as many as 150 in one location, lacked expiration dates to facilitate the commingling of expired and possibly incompatible drugs. This practice was also corroborated by CW3, a former Inventory Control and Demand Forecast Manager. Omnicare was required to destroy the expired products and immediately write them off of their balance sheets, but failed to do so due to the Company's intentional mishandling of expired drugs;

c.  As detailed in ¶¶132-136, the Individual Defendants fraudulently overvalued Omnicare's receivables. The Company overvalued its receivables by including receivables for which sales were improperly recorded, collection was never probable or reasonably assured and knowingly failed to adequately provide reserves for these and other uncollectible receivables as a charge to earnings;

        i.  According to CW4, a former Omnicare Account Specialist, it was management's decision not to adequately reserve for questionable

receivables and not to write-off known uncollectible receivables. CW4 submitted reports to defendant Gemunder and management that detailed which receivables required to be written-off. The basis for the required write-off was that all collection efforts have been exhausted and no future collections were anticipated. It was CW4's experience that defendant Gemunder denied almost every receivable write-off. Individual Defendants knew that if they began to write-off bogus receivables due from customers that they continued to do business with, that all current and past sales transactions with such customers would be jeopardized as GAAP precludes revenue recognition when "collectibility is [not] reasonably assured". These patients did not have immaterial outstanding receivable balances, rather substantial balances ranging from $400,000 to $2 million per account. Furthermore, CW4 indicated that the Individual Defendants failed to reserve or write-off receivables for debtors that have entered into bankruptcy proceedings. CW4 estimated that up to 60% of Omnicare's receivables were worthless, which equates to over $625 million and $850 million for 2Q 2005 and 3Q 2005, respectively. Had Individual Defendants properly accounted for Omnicare's uncollectible accounts and current transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated;

ii. CW5, a former Omnicare Collections Specialist for approximately two years, further detailed the collection issues within her geographic region for which she was responsible for collections. CW5 estimated that 25% of all individuals in LTC facilities located in her assigned region lacked prescription benefits. CW5 further indicated that of those individuals lacking prescription benefits that 40-60% lacked the resources to pay their debt balance due to Omnicare. If CW5's region is representative of all Omnicare's locations, Omnicare's net income before taxes would be overstated by at least $130 million and $175 million for the quarters ended June 30, 2005 and September 30, 2005, respectively. Had Individual Defendants properly accounted for these transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated;

d. On September 8, 2005, the Individual Defendants failed to disclose their practice of violating state laws and regulations in regards to drug recycling. According to CW2, the Company mishandled returned drugs by not only failing to record the drugs' lot numbers and expiration dates, but also mixing the drugs with different lot numbers and expiration dates into blister packs. It was Omnicare's procedure to take returned drugs and put them into vials that already contained drugs from other lots. CW2 explained that the vials were improperly mixed with pharmaceuticals that came from multiple sources, and thus, lacked critical data such as

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

expiration dates. As a result, Omnicare did not keep track of the pharmaceutical's "pedigree." This is in direct contravention of many state laws prohibiting the recycling of pharmaceuticals;

e.  On September 8, 2005, the Individual Defendants misinformed investors about compliance with federal and state laws and regulations over the purchasing of pharmaceuticals. For example, the Individual Defendants were actively engaged in Omnicare's policy of "therapeutic interchanges" when it illegally:

    i.  substituted capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac;

    ii.  substituted tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and

    iii.  substituted two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar. CW6, former executive assistant, informed plaintiff that Omnicare made the switches specifically from Ranitidine tablets to capsules simply to charge a higher price.

f.  But for Individual Defendants' improper accounting practices, Omnicare would not have achieved record revenues in the 2Q, 3Q and 4Q 2005.

61.  The August 3, 2005 press release also discussed Omnicare's monitoring of developments with the CMS in connection with the implementation of Part D and specifically quoted Gemunder stating:

"There are still many specifics yet to be determined through sub-regulatory guidance by CMS, as well as the approval of specific PDPs by CMS. . . .

*All things considered, we see nothing materially adverse about the regulations at this time and believe we are well-positioned to add value under the new Medicare Part D benefit. We will monitor developments and continue to ready our company as the year progresses.*"

62.     The same day, in a transcribed Omnicare 2Q 2005 Earnings Conference Call, commenting on the upcoming transition to Part D, Gemunder stated:

As you know, we expect about 45 to 50% of our pharmacy revenues will transfer out of Medicaid, and to a lesser extent, private pay, to Medicare Part D, a benefit offered by commercial market sponsors of prescription drug plans or PDP's, which are proved by CMS. *We have been extremely busy in the last couple of months, working with potential PDP's to familiarize them about the specialized services required and the nuances of providing pharmacy services to long-term care residents and negotiating agreements for our participation in their pharmacy networks to serve the long-term care market.*

*          *          *

. . . *[W]e are factoring in everything we know about pricing throughout the balance of this year, which has been announced or is proposed to be announced.* You know that we will be – in 2006, we leave the – for the most part, we leave the Medicaid program and go into the Part D program, which has a similar structure, but different pricing levels among 112 different PDPs. All of them have their own – there's a variation amongst all of them. So we're assuming that we're not going to be hurt – *we're pretty confident that we're not going to be hurt by moving into the Part D structure, vis-a-vis where we are now.* And I think that that's the most prudent assumption that we can make, and that's what our numbers imply and that's what you should infer from it.

63.     On August 4, 2005, in response to the 2Q 2005 press release and conference call, Jason Gurda, an analyst at Bear, Stearns & Co. Inc., stated, "*O[mnicare] continues to be upbeat about the implementation of Medicare Part D* . . ."

64.     The Individual Defendants' statements regarding the ease of the Company's transition to Part D were materially false and misleading when made.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

Individual Defendants knew or recklessly disregarded, but failed to disclose, the following:

    a.  On August 3, 2005, the Individual Defendants misled investors by not monitoring key developments with CMS and the new Part D program, and thus, not disclosing to investors the incompleteness of the online beneficiary database, essential for the successful implementation of the long awaited Part D plan. The beneficiary database is used by pharmacies to submit enrollment eligibility queries for Medicare beneficiaries and was incomplete since day one. The national database was run by NBC Health on behalf of CMS. Omnicare should have known of the database's deficiencies. Omnicare failed to check the database's completeness prior to the Part D transition despite assertions to monitor all Part D developments. During the first week of January 2006, the database did not have information on 50% of the beneficiaries. As a result, Omnicare could not figure out which patients were eligible for benefits or which PDPs to bill. These deficiencies created more work for the pharmacists who then had to call every PDP to verify coverage and access to medications, a process which initially took as long as several hours, and by the end of the Relevant Period was still taking 20-30 minutes;

    b.  On August 3, 2005, the Individual Defendants intentionally misled investors that everything was being done to work with and educate the PDPs to the nuances of pharmacy care, in an effort to smoothly transition into Part D. The Company failed to inform the PDPs of the requirements

    I:\OmnicareInc\Pleadings\ComplaintAmended.doc

during the Part D transition. Thus, the PDPs were hopelessly confused when they failed to follow certain transition guidelines. For example, Part D required access to any drug for dual eligible state and federal recipients for at least the first 30 days but the PDPs were not aware of this requirement and so eligible recipients were being denied access to much needed pharmaceuticals and services. In addition, the PDPs were rejecting claims for drugs that were not on their formulary list despite being required to cover the first fill of a drug. The formulary list is a list of pre-approved drugs the PDP is willing to reimburse Omnicare;

c.  But for defendant's inadequate internal controls to properly implement Part D, the transition was a colossal failure with a rejection of up to 40% of claims in addition to a high level of incomplete and inadequate prescription reimbursement. Further, Omnicare had trouble verifying patient eligibility and drug pre-authorization. Omnicare suffered numerous billing errors, including determining which PDP to bill, and demands for co-pays for dual eligible state and federal recipients who should not have had any. Consequently, the Company was forced to pay an additional $9.8 million in labor alone for the 1Q 2006 to cover overtime, billing issues and other associated cascading costs such as extra deliveries to nursing homes due to delays in obtaining drug approvals.

65.   A few days after the press release, on August 8, 2005, in the *Pharma Business Week*, "Pharmaceutical company caring for the elderly to acquire excelleRx," Omnicare announced that it had agreed to acquire excelleRx. The deal was later

completed on August 12, 2005, according to an Omnicare press release in *Business Wire*, entitled "Omnicare Completes Acquisition of excelleRx."

66.     Then again, on August 15, 2005, Omnicare issued another press release in the *Business Wire*, "Omnicare Completes Acquisition of RxCrossroads, L.L.C.," announcing the third acquisition in as many weeks.

67.     On November 2, 2005, the Company issued a press release entitled "Omnicare Reports Third Quarter 2005 Results," which stated in part:

> **"The exceptional results in our pharmacy services business reflect the continued success of our acquisition strategy in producing strong growth in our core institutional pharmacy business while broadening our platform for future growth", said Gemunder. "Our sales growth for the quarter was enhanced significantly by the contribution of the NeighborCare, excelleRx and RxCrossroads businesses.**
>
> **"Strong sales growth in the institutional pharmacy business was attributable not only to the addition of NeighborCare, but also to increased acuity, the expansion of clinical and other service programs, drug price inflation and market penetration of newer branded drugs, offset, in part, by the increasing use of generic drugs."**

68.     Further, on the same day, Hodges, in a transcribed conference call, reiterated Omnicare's financials through its bed metric stating:

> Our revenue per bed for the quarter rose to $1,083 per bed on an adjusted basis, up 10% sequentially, and 13% year-over-year. These increases are attributable to several factors. One, the NeighborCare beds have a slightly higher revenue per bed given their business mix. Two, drug price inflation. And three, a year-over-year uptick in IV sales. IV sales for the quarter totaled 69.4 million, up 39% sequentially, and up 47% year-over-year.

69.     On November 7, 2005, the Company issued a statement in response to rumors concerning the Company's illegal practices. Individual Defendants sought to dissuade investors from believing the rumors circulating about the Company:

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

"***Omnicare's policy is to comply with all applicable federal and state laws and regulations. To the best of our knowledge, our purchases of pharmaceuticals comply with all applicable laws and regulations and are consistent with Omnicare's goal of providing appropriate pharmaceutical care cost-effectively for the seniors we serve***."

70.     On November 8, 2005, the Individual Defendants filed Omnicare's quarterly report with the SEC on Form 10-Q for 3Q 2005. The Company's Form 10-Q was signed by defendants Gemunder and Froesel and affirmed the previously announced total revenues and financial results and stated: "Omnicare's Pharmacy Services segment recorded net sales of $1,410.7 million for the three months ended September 30, 2005, exceeding the 2004 amount of $1,021.0 million by $389.7 million, or 38.2%." The Form 10-Q stated:

> The sales growth for the three and nine months ended September 30, 2005 continues to be driven largely by the ongoing execution of the Company's acquisition strategy, particularly, the acquisitions of NeighborCare, excelleRx and RxCrossroads as discussed below. In addition, sales growth is also attributable to higher acuity in certain areas, the expansion of the Company's clinical and other service programs, drug price inflation and market penetration of newer branded drugs targeted at the diseases of the elderly, which often carry higher prices, but are significantly more effective in reducing overall healthcare costs than those they replace.

71.     In addition, the Company's Form 10-Q also contained certifications executed and submitted by defendants Gemunder and Froesel pursuant to §§302 and 906 of the Sarbanes-Oxley Act, which purported to confirm the veracity of Omnicare's financial statements, substantively as follows:

1.      I have reviewed this report on Form 10-Q of the Company;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.      The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

        (a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)     evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d)     disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors:

        (a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

\*        \*        \*

1.      The Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2005 (the "Periodic Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

2.      The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

72.    The Individual Defendants' statements regarding the Company's 3Q 2005 financial results, revenue growth and compliance with federal and state laws and regulations on November 2, 2005, November 7, 2005 and November 8, 2005 were materially false and misleading when made.  Individual Defendants knew or recklessly disregarded, but failed to disclose the following:

   a. As detailed in ¶¶124-131, the Individual Defendants fraudulently recognized revenues. The Company improperly recorded sales for which the earnings process was not complete, persuasive evidence of arrangements did not exist, delivery did not occur and collectibility was not reasonably assured.

        i. Individual Defendants improperly recorded revenues for products that were never delivered and for services that were never rendered to LTC facility residents;

        ii. Individual Defendants submitted claims and invoices to LTC facilities and patients for prescriptions that were never ordered or

for which the prescriptions were never provided to the LTC facilities residents;

iii. Individual Defendants submitted claims for services that were never rendered to LTC facility residents; and

iv. In certain circumstances, Individual Defendants did provide products and render services, but continued to submit multiple claims and invoices for these products and services. According to CW1, Omnicare had the ability to, and did, monitor such fictitious claims via internally generated reports referred to as Duplicate Claims Reports and Duplicate Pharmacy Reports. Such reports detailed duplicate prescriptions and services on both the medical and pharmacy side of Omnicare's fraudulent business. Omnicare went as far as to monitor these bogus claims by member number, month and date of service.

b. As detailed in ¶¶137-142, the Individual Defendants fraudulently overvalued Omnicare's inventory. The Company overvalued its inventory by not recording inventory at the lower of their cost or market value and intentionally failing to reserve for and write-off expired and obsolete products from their balance sheet as a charge to expenses;

i. According to CW2, drugs that were returned to their facilities were commingled with similar drugs in other vials. However, in many instances the returned drugs had expired and were worthless. Additionally, pharmacy personnel received products that came back

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

in the form of blister packs. Pharmacy personnel would open the returned blister packs and put the individual pills in generic vials that included pills from other lots and with varying expiration dates. CW2 noted that many of the vials, as many as 150 in one location, lacked expiration dates to facilitate the commingling of expired and possibly incompatible drugs. This practice was also corroborated by CW3. Omnicare was required to destroy the expired products and immediately write them off of their balance sheets, but failed to do so due to the Company's intentional mishandling of expired drugs;

c. As detailed in ¶¶132-136, the Individual Defendants fraudulently overvalued Omnicare's receivables. The Company overvalued its receivables by including receivables for which sales were improperly recorded, collection was never probable or reasonably assured and knowingly failed to adequately provide reserves for these and other uncollectible receivables as a charge to earnings;

i. According to CW4, it was management's decision not to adequately reserve for questionable receivables and not to write-off known uncollectible receivables. CW4 submitted reports to defendant Gemunder and management that detailed which receivables required to be written-off. The basis for the required write-off was that all collection efforts have been exhausted and no future collections were anticipated. It was CW4's experience that defendant Gemunder denied almost every receivable write-off.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

Individual Defendants knew that if they began to write-off bogus receivables due from customers that they continued to do business with, that all current and past sales transactions with such customers would be jeopardized as GAAP precludes revenue recognition when "collectibility is [not] reasonably assured." These patients did not have immaterial outstanding receivable balances, rather substantial outstanding balances ranging from $400,000 to $2 million per account. Furthermore, CW4 indicated that the Individual Defendants failed to reserve or write-off receivables for debtors that have entered into bankruptcy proceedings. CW4 estimated that up to 60% of Omnicare's receivables were worthless, which equates to over $625 million and $850 million for 2Q 2005 and 3Q 2005, respectively. Had Individual Defendants properly accounted for Omnicare's uncollectible accounts and current transactions, their net income and EPS during the Relevant Period would be completely eliminated;

ii. CW5, further detailed the collection issues within her geographic region for which she was responsible for collections. CW5 estimated that 25% of all individuals in LTCs located in her assigned region lacked prescription benefits. CW5 further indicated that of those individuals lacking prescription benefits that 40-60% lacked the resources to pay their receivable balance due Omnicare. If CW5's region is representative of all Omnicare's locations,

Omnicare's net income before taxes would be overstated by at least $130 million and $175 million for the quarters ended June 30, 2005 and September 30, 2005, respectively. Had Omnicare properly accounted for these transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated;

d. On November 7, 2005, the Individual Defendants failed to disclose their practice of violating state laws and regulations in regards to drug recycling. According to CW2, the Company mishandled returned drugs by not only failing to record the drugs' lot numbers and expiration dates, but also mixing the drugs with different lot numbers and expiration dates into blister packs. It was Omnicare's procedure to take returned drugs and put them into vials that already contained drugs from other lots. CW2 explained that the vials were improperly mixed with pharmaceuticals that came from multiple sources, and thus, lacked critical data such as expiration dates. As a result, Omnicare did not keep track of the pharmaceutical's "pedigree." This in direct contravention of many state laws prohibiting the recycling of pharmaceuticals;

e. On November 7, 2005, the Individual Defendants misinformed investors about compliance with federal and state laws and regulations over the purchasing of pharmaceuticals. For example, the Individual Defendants were actively engaged in a policy of "therapeutic interchanges" when Omnicare illegally:

    i.   substituted capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac;

    ii.   substituted tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and

    iii.   substituted two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar. CW6, informed plaintiff that Omnicare made the switches specifically from Ranitidine tablets to capsules simply to charge a higher price.

    f.  But for Individual Defendants' improper accounting practices, Omnicare would not have achieved record revenues in the 2Q, 3Q and 4Q 2005.

73.    Later, the November 2, 2005 press release further discussed the CMS and its role in the implementation of Part D, directly quoting Gemunder:

> "***We remain highly focused on the upcoming implementation of the Medicare Drug Benefit. While bringing about sweeping change in our industry, we believe we are well-positioned to add value under the new Medicare Part D benefit***. To date, Omnicare has signed numerous agreements with Medicare Part D Plans across the United States, including a number of organizations planning to provide national coverage, as well as many agreements with regional and local plans also intending to provide the Medicare Prescription Drug Benefit beginning in 2006. The PDPs with whom we've partnered have largely recognized the specialized services required for long-term care residents, as well as Omnicare's experience and expertise in providing pharmaceutical care in this market. As the enrollment process begins, we are busy educating our long-term care facility clients and their residents on the availability and implementation of the new drug benefit . . . ."

74.    Further, in the November 2, 2005 transcribed Omnicare 2Q 2005 Earnings Conference Call, commenting on the upcoming transition to Part D, Gemunder lauded the Company's efforts and abilities to easily convert to Part D stating:

> [W]e expect 45 to 50% of our revenues will transition out of Medicaid, and to a lesser extent private pay, into Medicare part D, where we will be

dealing with the commercial market sponsors of prescription drug plans or PDP's, for these residents.

*          *          *

. . . **So we have been focused this quarter on training and on educating our employees, and seeing to the operational issues, related to the implementation of the new drug benefit**. And with the enrollment period beginning November 15th, we have also been heavily been [sic] engaged in educating our long-term care facility clients and their residents, on the availability of the new benefit, as well as working with them on the implementation process.

*          *          *

. . . [F]ortunately our industry, we've had to make a number of changes to our computers, which I believe are well behind us now, because we recognized this early on, because you have to have online adjudication up front, and not all of our units, some of the smaller units didn't have it, and they all have it now.

But we're fortunate in the sense that we have been dealing with third-party payors for many, many years, and are used to billing third-party payors, in other words, we've been billing the PBMs for some of the patients, for example GM retired, General Motors retirees would have a post retirement benefit, and we would have to deal with that, and billing GM.

**And so we're used to billing hundreds and hundred of third party payers. And now that we have the online adjudication system in . . . for anybody who wants to bill these PDPs, and in our case, that's already in place and functioning properly**.

75.     The Individual Defendants' statements regarding the ease of the Company's transition to Part D were materially false and misleading when made. Individual Defendants knew or recklessly disregarded, but failed to disclose, the following:

a.    On November 2, 2005, the Individual Defendants misled investors by not monitoring key developments with CMS and Part D, and thus, not disclosing to investors the incompleteness of the online beneficiary database, essential for the long-awaited successful implementation of Part

D. The beneficiary database is used by pharmacies to submit enrollment eligibility queries for Medicare beneficiaries and was incomplete since day one. The national database was run by NBC Health on behalf of CMS. Omnicare should have known of the database's deficiencies. Omnicare failed to check the database's completeness prior to the Part D transition despite assertions to monitor all Part D developments. During the first week of January 2006, the database did not have information on 50% of the beneficiaries. As a result, Omnicare could not figure out which patients were eligible for benefits or which PDPs to bill. These deficiencies created more work for the pharmacists who then had to call every PDP to verify coverage and access to medications, a process which initially took as long as several hours, and by the end of the Relevant Period was still taking 20-30 minutes;

b. On November 2, 2005, the Individual Defendants intentionally misled investors that everything was being done to work with and educate the PDPs, to the nuances of pharmacy care, in an effort to smoothly transition into Part D. The Company failed to inform the PDPs of the requirements during the Part D transition. Thus, the PDPs were hopelessly confused when they failed to follow certain transition guidelines. For example, Part D required access to any drug for dual eligible state and federal recipients for at least the first 30 days but the PDPs were not aware of this requirement and so eligible recipients were being denied access to much needed pharmaceuticals. In addition, the PDPs were rejecting claims for

drugs that were not on their formulary list despite being required to cover the first fill of a drug;

c.  On November 2, 2005, the Individual Defendants misled investors to believe that the Company was training and educating its employees to the implementation of Part D. However, CW7, who was billing processor and collections specialist at Omnicare's headquarters in Kentucky, for five years, informed plaintiffs that the training and handling of Part D issues was left to each individual pharmacy to decipher. Moreover, CW7 indicated that training on Part D was relegated to approximately half of a workday, or four hours. This ineffective training approach was confirmed by CW8, another former Billing Clerk employed at Omnicare for over seven years. CW8 stated that meetings were not held until the middle of the months in January and April 2006, well after Part D's implementation and that employees did not know to handle Part D. In addition, the witnesses informed plaintiffs that in these meetings the billing staff was simply given a thumbnail sketch of Part D and told that there would be additional work coming in. To make matters worse, CW8 said the billing employees would be instructed by the Billing Manager to do one thing one day and something completely different on another day, adding to the environment of confusion already in existence;

d.  On November 2, 2005, the Individual Defendants failed to disclose Omnicare's inability to properly bill the third party PDPs. That the Company simply could not bill as many as 40% of the claims in the first

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

weeks of the Part D transition was a direct contradiction of the very claim Omnicare touted itself as being most capable of doing due to its experience with other third party payers such as General Motors. Instead, Omnicare's pharmacists were forced to blindly call, and wait on hold with the various PDPs until they located the specific PDP covering the Medicare beneficiary for whom they were calling;

e. Because of the Individual Defendants' inadequate internal controls to properly implement Part D, the transition was a colossal failure with a rejection of up to 40% of claims in addition to a high level of incomplete and inadequate prescription reimbursement. Further, Omnicare had trouble verifying patient eligibility and drug pre-authorization. Omnicare suffered numerous billing errors, including determining which PDP to bill, and demands for co-pays for dual eligible state and federal recipients who should not have had any. Consequently, the Company was forced to pay an additional $9.8 million in labor alone for the 1Q 2006 to cover overtime, billing issues and other associated cascading costs such as extra deliveries to nursing homes due to delays in obtaining drug approvals.

76. On December 15, 2005, the Company issued a press release entitled "Omnicare Completes Offerings of $750 Million of Senior Subordinated Notes, $977.5 Million of Convertible Senior Debentures and 12,825,000 Shares of Common Stock." The release stated in part:

> Omnicare, Inc. (the "Company") today announced that it has completed its offering of 12,825,000 shares of common stock (not including the underwriters' option to purchase additional shares) at $59.72 per share, and also has completed its offerings of $225 million aggregate principal

amount of 6 3/4% senior subordinated notes due 2013, $525 million aggregate principal amount of 6 7/8% senior subordinated notes due 2015 and its offering of $977.5 million aggregate principal amount of 3.25% convertible senior debentures due 2035 (including the exercise in full by the underwriters of their option to purchase additional debentures).

Lehman Brothers, J.P. Morgan and SunTrust Robinson Humphrey acted as joint book-running managers and CIBC World Markets, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the senior subordinated notes offering. J.P. Morgan, Lehman Brothers and CIBC World Markets acted as joint book-running managers and SunTrust Robinson Humphrey, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the convertible debentures offering. Lehman Brothers, J.P. Morgan and Merrill Lynch & Co acted as joint book-running managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

77.     On January 12, 2006, the Company issued a press release entitled

"Omnicare Announces Exercise of Underwriter's Option to Purchase Additional Shares,"

which stated in part:

Omnicare, Inc. today announced that the underwriters of its previously announced common stock offering of 12,825,000 shares of common stock, which closed on December 15, 2005, have exercised their option in part to purchase an additional 850,000 shares of common stock at $59.72 per share less underwriting discounts and commissions. The sale of the additional shares is expected to close on January 17, 2006.

Lehman Brothers, J.P. Morgan and Merrill Lynch & Co acted as joint bookrunning managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

78.     Everything began to collapse when, on January 13, 2006, *Reuters News*

published an article entitled "Update 1-Omnicare says gets subpoena from U.S.

Attorney" which stated:

Omnicare Inc., a provider of drugs to nursing homes, said on Friday it received a subpoena from the U.S. Attorney from Massachusetts seeking information about its relationships with manufacturers and distributors of certain pharmaceutical products.

The Covington, Kentucky-based company said it understands the federal government and certain U.S. states are investigating allegations related to three generic drugs provided by Omnicare.

***Omnicare said it believes its purchases of pharmaceuticals comply with all applicable laws and regulations and added that it is cooperating fully with the probe***.

The company, which acknowledged the subpoena in a regulatory filing, said it believes the investigation involves the substitution of certain forms or doses of generic drugs.

It said it believes the government was looking into the substitution of capsules of Ranitidine, a generic GlaxoSmithKline's heartburn drug Zantac; tablets for capsules of Fluoxetine, a generic version of Eli Lilly and Co's of the antidepressant Prozac; and the substitution of two 7.5 milligram tablets for one 15 mg tablet of Buspirone, a generic of Bristol-Meyers Squibb Co's BuSpar antianxiety drug.

79.    On January 16, 2006, the *Cincinnati Business Courier* published an article

entitled "Omnicare subpoenaed in generic drug probe," which stated in part:

Omnicare Inc. has been subpoenaed in an investigation of generic drug distribution.

The U.S. Attorney for Massachusetts has asked for information about Omnicare's relationships with manufacturers and distributors of three pharmaceutical products, the company said in a news report.

Omnicare defended its pharmaceutical purchases, saying it complied with regulations and will cooperate in the investigation.

Covington-based Omnicare said it believes the government is investigating allegations of substitution of three generic drugs:

- Substituting capsules for tablets of Ranitidine, a generic form of the heartburn drug Zantac;

- Giving tablets instead of capsules of Fluoxetine, a generic form of the antidepressant Prozac; and

- Substituting two 7.5 milligram tablets for a single 15 milligram tablet of Buspirone, a generic form of the anti-anxiety drug BuSpar.

In September, Johnson & Johnson had been subpoenaed for documents concerning sales and marketing of eight drugs to Omnicare.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

80.     On January 17, 2006, *TheStreet.com* published an article entitled "Probe

News Punishes Omnicare Shares," which stated in part:

> Omnicare is feeling some regulatory pain.
>
> The institutional pharmacy has found itself caught up in two government probes even as it struggles to overcome major glitches associated with the new Medicare Part D drug coverage program. The company recently learned that federal and state officials have begun investigating allegations surrounding three generic drugs that it supplies to its nursing home patients. In addition, it has fielded questions from a federal prosecutor about its relationship with certain drug manufacturers.
>
> The first probe seems to involve Omnicare directly. Based on a regulatory filing Omnicare made late Friday, the government is seeking information about the pills the company supplies to treat three common ailments. Specifically, the filing indicates, the government is questioning whether Omnicare improperly substituted two 7.5-milligram Buspirone anti-anxiety tablets for one 15- milligram tablet, Fluoxetine anti-depression tablets for capsules and Ranitidine heartburn capsules for tablets.

81.     Then on January 19, 2006, *The Cincinnati Enquirer* published an article,

entitled "Omnicare Inc. site searched," informing the public:

> The Ohio Attorney General's Office said Wednesday that it conducted a court-approved search of an Omnicare Inc. operation in Dublin, Ohio, last week in pursuit of evidence to support suspected acts of Medicaid fraud.
>
> *          *          *
>
> "Within these offices, documents and record are being kept that are applicable to the scheme, plan, or system of O[mnicare Health Network] in the commission of Medicaid fraud," states the search warrant obtained Wednesday by The Enquirer.
>
> *          *          *
>
> Omnicare spokesman Andy Brimmer said company policies forbid it from discussing possible governmental reviews but also call for cooperation with authorities.
>
> "That said, we have received a letter with certain allegations from two former employees," Brimmer said. "We reviewed the allegations and, while our review is still ongoing, we believe the allegations are unfounded." He would not say whether the allegations mirrored those of the state.

*      *      *

The company, which has more than $6 billion in annual revenue, said last Friday it had received administrative subpoenas from the U.S. Attorney's Office in Boston for the information about its "relationships" with drug makers and distributors it didn't name. It said the government and certain unnamed states are investigating allegations of dosage substitutions for three generic drugs.

82.     Then on January 27, 2006, *The Cincinnati Enquirer* published an article entitled "Omnicare Offices in Mich. Raided." The article stated:

The Michigan attorney general's office said Thursday that its agents led a raid of Omnicare Inc. offices in the Detroit suburb of Livonia and other unspecified cities in search of information it would not disclose.

"The only thing that I can confirm is that the attorney general's office is executing search warrants, but I can't give you any details because this is an ongoing investigation," said Melissia Christianson, a spokeswoman for the agency.

Omnicare already has had three publicized run- ins with law enforcement officials in 2006. Earlier this month, the company received a subpoena from the U.S. Attorney's Office in Boston for information about the sale of three generic drugs.   On Jan. 18, the Ohio attorney general's office conducted a search of an Omnicare unit in Dublin that sells equipment such as wheelchairs and walkers.

An Omnicare spokesman would not discuss the raid Thursday in Michigan.

"I can't confirm or comment on government investigations," spokesman Andy Brimmer said.

The attorney general's office in Michigan can bring both civil and criminal actions in that state. Christianson said no cases have been filed in connection with Thursday's raid.

83.     The Michigan raid prompted Jerry Doctrow, an analyst at Stifel Nicoloaus, to state on January 30, 2005, "While earlier investigations on which we had some information did not appear material, it appears the company may be the focus of a coordinated effort by multiple states to investigate Omnicare's drug pricing under state Medicaid programs . . . . [W]e are lowering our ratings on O[mnicare] to Hold."

84.   On January 30, 2006, *Associated Press* published an article entitled "Omnicare Shares Drop on Michigan Raid Report; Omnicare Declines Comment on Report of Michigan Raid; Stock Falls on Report, Analyst Downgrade." The article stated in part:

> Omnicare Inc. shares fell more than 10 percent Monday following a published report of a raid at the company's offices in Livonia, Mich., and an analyst downgrade on that report.
>
> The Cincinnati Enquirer said Friday that the Michigan attorney general's office raided Omnicare's offices in Livonia and other cities last week. The company, which provides pharmacy services for long-term care facilities, also operates pharmacies in Grand Rapids, West Branch and Escanaba, Mich., according to the newspaper.
>
> No details were released on the nature of the search. In a statement Monday, Omnicare declined to comment on, or confirm, whether there was a review. The company said it operates within a highly regulated industry which makes it, and industry peers, subject to government reviews and inquires on a regular basis.
>
> The Covington, Ky.-based company added its goal is "to comply with all laws and regulations."
>
> Jerry L. Doctrow, an analyst with Stifel Nicolaus, downgraded the stock to "Hold" from "Buy" citing his concerns regarding the raid.
>
> Doctrow reiterated his optimism about Omnicare's earnings prospects, but said he was "troubled" by news of a fourth investigation at Omnicare's offices since the beginning of the year, and was concerned about the potential for further raids.
>
> He speculated that the raid may be part of a coordinated multistate review of Omnicare's drug pricing under state Medicaid programs.

85.   On May 10, 2006 the *Cincinnati Business Courier*, in an article entitled "Omnicare adjusts 1Q earnings" reported that Omnicare announced a charge of $34.1 million to establish a litigation fund related to the federal investigation and subsequent lawsuits.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

**Knowledge of the Fraud**

86.     Throughout the Relevant Period, defendants Gemunder, Froesel and Hodges held themselves out to investors and the market as the persons most knowledgeable at Omnicare about the Company's geriatric pharmaceutical services business, accounting, financial statements, Part D transition and business operations and condition. As described more fully in ¶¶55-59, 60-64, 67-68, 70-75, each of the Individual Defendants held one of the most senior positions at Omnicare with responsibility for directing and managing the Company's business, accounting and financial reporting.

87.     Gemunder's knowledge is unquestionable. CW3 recalls meeting with the defendant on several occasions to discuss Omnicare's lagging sales efforts and inability to retain business causing the bed losses. Through these meetings CW3 discovered that Gemunder's forte was mergers and acquisitions, and consequently, Gemunder was well informed about all aspects of Omnicare, LTC facilities and pharmacy facilities. Thus, Germander was intimately familiar with all the inner workings of Omnicare. CW3 also confirmed that Gemunder behaved in an extraordinary controlling manner, making for an extremely tense working environment. Every detail and nuance of the business, even something as innocuous as, the purchase of a new $900 computer required Gemunder's approval. Gemunder on several occasions acknowledged Part D would comprise 40-50% of Omnicare's business in addition to meetings with CW3, had intimate knowledge of the Company's failings. There was not one aspect of Omnicare of which Gemunder did not personally make himself aware and necessary.

88.     In addition, CW3 informed plaintiff that Froesel had direct knowledge of Omnicare's poor performance as he was responsible for signing commission checks, a useful tool in determining sales growth. The higher the commissions the more sales generated. Froesel knew from the commission amounts that the Company was not performing in the manner he and the other Individual Defendants were leading the investing public to believe. In addition to Froesel's knowledge of Omnicare's poor sale growth, Froesel was further implicated by CW6, for his culpability in the drug substitution scandal. CW6 claimed Froesel would contact Regional CFOs twice each quarter to implement the therapeutic interchange program where the more expensive branded drugs were substituted for the cheaper and less profitable generic drugs. The CW6 specifically recalls Ranitidine as being one of many drugs switched at Froesel's request. According to CW6, Froesel did this to give the particular subsidiary pharmacy a revenue boost in order to make its monthly or quarterly revenue numbers. Moreover, CW6 stated Froesel directed, through conference calls, the pharmacies to increase the price of a particular drug for a private pay patient in its client LTC facilities in order to make the quarterly numbers.

89.     Defendants Gemunder, Froesel and Hodges also routinely communicated with analysts and investors during the Relevant Period and represented themselves as being informed of and knowledgeable about Omnicare's business and finances, specifically regarding the Company's transition to Part D, corporate acquisitions, and note offerings. Each of these defendants – Gemunder, Froesel, and Hodges – participated in Omnicare's quarterly conference calls with analysts and investors. In the course of these calls, defendants presented information regarding Omnicare's revenue

growth, market outlook, accounting acumen, adaptation to changing market factors, corporate acquisitions and transition to Part D. In addition, defendants represented that they had intimate knowledge of these areas and responded to questions focused on revenue growth, accounting and financial reporting and Omnicare's ability to adjust to changing conditions in the market.

90.     Consistent with their false and misleading representations on conference calls, defendants Gemunder and Froesel signed and certified, based on their knowledge and positions as executive officers, Omnicare's SEC filings during the Relevant Period. Specifically, defendants Gemunder and Froesel signed all of the Company's Form 10-Q filings, attesting to their own personal knowledge of the factual basis for the reported information and purported accuracy of the information. According to CW9, former Omnicare Director of External Financial Reporting, drafts of the Company's 10-K and 10-Q SEC filings were extensively circulated for review and analysis by, among others, Gemunder and Froesel, resulting in feedback from the recipients including numerical and grammatical changes before the statements were ultimately certified and submitted to SEC for filing. The Individual Defendants' Relevant Period statements and certifications establish that they were intimately involved in Omnicare's business affairs, accounting and financial reporting. The statements included in Omnicare's SEC filings during the Relevant Period and certified to be true and accurate by the Individual Defendants were false and misleading to the investing public. The Individual Defendants knew the statements to be false and misleading but signed off on them to keep stock artificially inflated thus making the Company look financially viable.

**Corporate Acquisitions and Note and Stock Offerings**

91.    The Company defendants acquired three companies just prior to and during the Relevant Period, paid for with the proceeds from a $3.4 billion Credit Agreement. As a result of the acquisitions, Omnicare acquired over 340,000 beds, and consequently, hid its own sagging bed count. This favorable bed metric masked the Company's lost business, making Omnicare appear more profitable, which not only helped the Company to secure favorable terms on the Credit Agreement, but also artificially inflated the stock price by portraying a solid revenue stream. Individual Defendants then parlayed the artificially inflated stock price of nearly $60 into a note and stock offering later in the Relevant Period, totaling over $2.5 billion, to enable them to pay off the Credit Agreement. This acquisition strategy is explained in more detail below.

**Corporate Acquisitions**

92.    Just prior to the Relevant Period, on July 28, 2005, Omnicare issued a press release over the *Business Wire*, entitled "Omnicare Completes Acquisition of NeighborCare," announcing the Company's acquiring of its closest competitor:

> Omnicare has been advised by The Bank of New York, the depositary for the tender offer, that, as of 12:00 Midnight, New York City time, on Wednesday, July 27, 2005, approximately 42,897,600 shares (including approximately 7,135,202 shares subject to guaranteed delivery) of NeighborCare's common stock had been tendered and not withdrawn, which represents approximately 97.2% of the outstanding shares of common stock. Omnicare, through its wholly owned subsidiary Nectarine Acquisition Corp., has accepted for payment all of the shares of common stock that have been validly tendered and not properly withdrawn prior to the expiration of the tender offer.
>
> In accordance with the terms of the Agreement and Plan of Merger, dated as of July 6, 2005, by and among Omnicare, Nectarine Acquisition Corp. and NeighborCare, Omnicare caused Nectarine Acquisition Corp. to merge with and into NeighborCare on Thursday, July 28, 2005. In the merger, each of the remaining shares of NeighborCare common stock, other than shares for which appraisal rights are properly demanded, was

converted into the right to receive $34.75 per share net to the holder in cash, without interest and less required withholding taxes. NeighborCare is now a wholly owned subsidiary of Omnicare.

"This is an important day for Omnicare's shareholders and for our combined customer and employee bases as we are now able to begin realizing the compelling strategic value and benefits we envisioned from this acquisition," said Joel F. Gemunder, Omnicare president and chief executive officer. "The combination of our two companies creates a premier institutional pharmacy company and a nationwide leader in the healthcare industry. Together, we will have an expanded geographic presence and broader array of superior services and an ability to generate economies of scale and operational synergies. The combination makes our business stronger and more efficient while creating additional value for our shareholders.

The transaction will enhance Omnicare's position as the leading provider of pharmacy services for the elderly and will bring Omnicare's total number of beds served to nearly 1.4 million, an increase of approximately 27%. The combined company will have a nationwide network of pharmacies serving long-term care providers in 47 states, the District of Columbia and Canada. Based upon results for Omnicare and NeighborCare for the quarter ended March 31, 2005, Omnicare's combined annualized revenues on a pro forma basis will be approximately $6.0 billion. Given the substantial economies of scale and cost synergies anticipated from the acquisition, it is expected that it will be significantly accretive to Omnicare's diluted earnings per share in 2006 and beyond.

93.    On August 12, 2005, according to an Omnicare press release, *Business Wire*, "Omnicare Completes Acquisition of excelleRx:"

"We are pleased to announce the completion of our acquisition of excelleRx, as it significantly enhances Omnicare's position in the rapidly expanding hospice market," said Joel F. Gemunder, president and chief executive officer of Omnicare. "As important, its sophisticated technology and call center infrastructure, together with its clinical resources and expertise, will serve as a strong platform for the expansion of our pharmaceutical care and disease management capabilities in the broader marketplace."

ExcelleRx, based in Philadelphia, Pennsylvania, provides pharmaceutical products and pharmaceutical care services for approximately 400 hospice agencies with approximately 48,000 patients in 46 states. Through three state-of-the-art call centers in Philadelphia, Memphis and Phoenix, excelleRx pharmacists and client support staff work with hospice nurses and physicians to provide clinical consultations and process patient

medication orders. ExcelleRx fulfills prescription orders through its two mail service pharmacies in Philadelphia and Memphis and through a network of pharmacies throughout the U.S. Total revenues for excelleRx are currently running at the annualized rate of approximately $130 million.

94.     Then again, on August 15, 2005, Omnicare issued another press release in the *Business Wire*, "Omnicare Completes Acquisition of RxCrossroads, L.L.C.," announcing the third acquisition in as many weeks. The article quotes Gemunder stating:

> "We are pleased to complete this acquisition as it creates a number of strategic and financial benefits for Omnicare . . . The combination makes Omnicare the only provider of end-to-end custom product solutions to pharmaceutical and biotechnology companies. Moreover, with RxCrossroads, we see opportunities to enhance growth through leveraging our existing clinical research and institutional pharmacy infrastructure, to provide greater service offerings and to expand on our client relationships with pharmaceutical and biotechnology companies."

95.     The Individual Defendants were motivated to complete the acquisitions in an effort to perpetuate the fraudulent scheme and course of business complained of, raising Omnicare's bed metric and thus hiding its inability to retain customers. Individual Defendants relied on these acquisitions to replace lost revenue and beds in the pharmacy services business. Just prior to the Relevant Period, Omnicare acquired its largest competitor, NeighborCare, as well as two additional companies, excelleRx and RxCrossroads, during the Relevant Period to become the largest geriatric pharmaceutical services company in the United States. The Individual Defendants caused the Company to spend approximately $1.5 billion in cash consideration to complete the acquisition of the three companies, and spent an additional $400 million in acquiring debt and transaction costs, in furtherance of the fraud. The Individual Defendants utilized Omnicare's bed count as a metric to illustrate performance and then finance the capital expenditures with proceeds from a $3.4 billion Credit Agreement.

The purpose of these acquisitions was to hide from the investing public Omnicare's declining bed count, as the acquisitions contributed over 340,000 beds to the Company's 1.44 million. As CW3, stated, Omnicare was losing on average 10,000 beds a month, but the Company was able to maintain the fraud with the over 340,000 beds acquired.

96.     According to CW3 Omnicare had trouble obtaining new business. The Company had a reputation among its customers for poor services and offered pricing that was not competitive for the level of service it provided. This poor service, particularly in the absence of discounted prices, led to inferior sales and high sales force turnover that compounded the sagging sales. CW3 also informed plaintiff of Omnicare's policy of subsidiary pharmacies being responsible for generating new business, which resulted in Omnicare pharmacies and sales team competing for the same business and pricing. Thus, the Individual Defendants hampered Omnicare's ability to gain new clientele.

97.     Further, CW3 stated Omnicare actually lost 5% of its beds under contract per month in his region. In fact, CW3 stated this information came to light every month in a bed loss report illustrating the figures on the amount of business lost. Rather, the Individual Defendants implemented the acquisition strategy in an effort to disguise the Company's retention shortfalls.

98.     Further, Omnicare's bed metric determines the Company's strength and growth potential, and thus, its stock price. As one analyst, Steven P. Halper of Thomas Weisel Partners, noted, the "acquisitions should continue to drive Omnicare's growth." By maintaining the appearance of growth through the Company's bed metric, Individual

Defendants were far better positioned to receive more favorable terms for Omnicare in the $3.4 billion Credit Agreement. Omnicare, thus, obtained lower interest rates of 4.55% for the 364-Day Loan part and 4.49% for the Revolving Loan's portion. In addition, Omnicare successfully offered 13.7 million shares of stock for over $59.00 per share. The Company obtained extremely low interest rates for three notes, 6-7/8%, 6-3/4%, and 3-1/4%. This put tremendous pressure on Individual Defendants to present Omnicare's business and finances in a very favorable light. Individual Defendants then decided to obfuscate the evidence that Omnicare was not obtaining new business or retaining its existing business in the geriatric pharmaceutical services industry. Rather the Individual Defendants set forth a complex shell game in which they acquired other companies to raise their net bed count; all the while they were steadily losing beds by giving the appearance of prosperity. Individual Defendants would acquire a company and gain hundreds of thousands of beds raising the metric, while keeping the investing public unaware that Omnicare was losing on average 10,000 beds a month. The metric thus stayed high, and consequently artificially inflating the Company's stock price, while Omnicare was in fact hemorrhaging beds and the profits gained therefrom.

99.     Acquisitions by Omnicare just prior to and during the Relevant Period facilitated by Individual Defendants' false statements and the Company's artificially inflated stock price are summarized on the chart below:

| Date | Acquired Entity | Consideration | Beds |
|---|---|---|---|
| 07/28/05 | Neighbor Care, Inc. | $1.9 billion in cash consideration and transaction Costs | 295,000 |

| 08/12/05 | excelleRx, Inc. | $269 million in cash Consideration | 48,000 |
| 08/15/05 | RxCrossroads, L.L.C. | $235 million in cash consideration | N/A |

**Note and Stock Offerings**

100.   Individual Defendants then utilized Omnicare's inflated stock price to complete $2.5 billion in public offerings during the Relevant Period. As the Company noted in a press release on December 5, 2005, " it will use the proceeds to pay down its $1.9 billion 364-Day Loan facility, and buy back any of its outstanding $375 million of its 8.125 percent senior subordinated notes maturing in 2011."

101.   On December 15, 2005, the Company issued a press release entitled "Omnicare Completes Offerings of $750 Million of Senior Subordinated Notes, $977.5 Million of Convertible Senior Debentures and 12,825,000 Shares of Common Stock." The release stated in part:

> Omnicare, Inc. (the "Company") today announced that it has completed its offering of 12,825,000 shares of common stock (not including the underwriters' option to purchase additional shares) at $59.72 per share, and also has completed its offerings of $225 million aggregate principal amount of 6 3/4% senior subordinated notes due 2013, $525 million aggregate principal amount of 6 7/8% senior subordinated notes due 2015 and its offering of $977.5 million aggregate principal amount of 3.25% convertible senior debentures due 2035 (including the exercise in full by the underwriters of their option to purchase additional debentures).
>
> Lehman Brothers, J.P. Morgan and SunTrust Robinson Humphrey acted as joint book-running managers and CIBC World Markets, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the senior subordinated notes offering. J.P. Morgan, Lehman Brothers and CIBC World Markets acted as joint book-running managers and SunTrust Robinson Humphrey, Wachovia Securities, Merrill Lynch & Co. and Credit Suisse First Boston acted as co-managers for the convertible debentures offering. Lehman Brothers, J.P. Morgan and

Merrill Lynch & Co acted as joint book-running managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

102.   On January 12, 2006, the Company issued a press release entitled

"Omnicare Announces Exercise of Underwriter's Option to Purchase Additional Shares,"

which stated in part:

Omnicare, Inc. today announced that the underwriters of its previously announced common stock offering of 12,825,000 shares of common stock, which closed on December 15, 2005, have exercised their option in part to purchase an additional 850,000 shares of common stock at $59.72 per share less underwriting discounts and commissions. The sale of the additional shares is expected to close on January 17, 2006.

Lehman Brothers, J.P. Morgan and Merrill Lynch & Co acted as joint bookrunning managers and Wachovia Securities, CIBC World Markets, SunTrust Robinson Humphrey and Thomas Weisel Partners acted as co-managers for the common stock offering.

103.   The three note offerings and two stock offerings discussed in ¶¶100-102,

are summarized on the chart below:

| DATE | OFFERING | TERMS | PROCEEDS | PURPOSE |
|------|----------|-------|----------|---------|
| 12/15/2005 | Stock | $59.72 per share | $765,909,000 | To repay debt |
| 12/15/2005 | Note | 6.75% Note Due 2013 | $225,000,000 | To repay debt |
| 12/15/2005 | Note | 6.875 % Note Due 2015 | $525,000,000 | To repay debt |
| 12/15/2005 | Note | 3.25% Note due 2035 | $977,500,000 | To repay debt |
| 1/17/2006 | Stock | $59.72 per share | $50,762,000 | To repay debt |

104.   These offerings were necessary and used, in part, to repay Omnicare's debt. As of September 30, 2005, Omnicare had current and long term debt of $3.4 billion from the acquisitions. The offerings, which benefited from Omnicare's high stock price and favorable image among investors, were also necessary to generate working capital and cover capital expenditures, acquisitions and investments. Omnicare used the stock offerings to payoff over half of the Credit Agreement and consolidated the interest rate on its senior subordinated notes as discussed in ¶¶100-102, saving the Company millions. Specifically, Omnicare would not have received favorable terms to repay its debt without the Individual Defendants' perpetrated fraud.

**Executive Compensation**

105.   The Individual Defendants were highly motivated by the terms of their employment agreements, which tied their compensation directly to Omnicare's reported financial results and operating performance. A large portion of each of the compensation packages was dependent upon Omnicare posting favorable financial results. In addition to maintaining their employment positions, the personal wealth of each of the defendants was dramatically enhanced by the reported business condition and business performance of Omnicare, as well as the Company's stock price and market capitalization, all of which were inflated by Individual Defendants' misleading statements and material omissions. Defendant Gemunder alone pocketed more than $17 million in total compensation for 2005, while defendant Froesel pocketed over $2.5 million and defendant Hodges reaped more than $2.0 million in 2005. In total, the Individual Defendants fraudulently took in more than $20 million in incentive-based compensation during 2005.

106.   Pursuant to Omnicare's Proxy dated April 13, 2006, the Compensation and Investment Committee established fixed guidelines for the annual incentive bonuses and long-term incentive compensation restricted stock awards, which were both based on the growth of Omnicare's EPS, operational goals, such as sales and earnings growth, and performance goals, such as preparation and implementation of Part D.

107.   Moreover, of the Individual Defendants' $20 million compensation, approximately $16 million came from restricted stock swards. Under the Company's stock award program, every year restricted shares of Common Stock were issued as incentive compensation for services rendered during the year to the Individual Defendants. The purpose of the plan is to promote continued service to the Company. This agenda is accomplished by allowing the restricted shares to vest in seven annual installments, with a greater proportion vesting in the latter years or ratably over 10 years. Further, if the defendant's employment were to terminate, the unvested shares are forfeited. As a result, the Individual Defendants motive to keep their jobs by falsifying financials and artificially inflating the stock price is simple; should the defendants be terminated prior to the maturity of their respective restricted stock awards they would each lose a great deal of money. Gemunder would lose an aggregated $65,890,890, Froesel another $13,779,205 and Hodges stands to lose a total $11,717,855 for a total over of $91 million.

### INDIVIDUAL DEFENDANTS' INSIDER STOCK SALES

108.   During the Relevant Period, Defendants Hutton, Gemunder, and Froesel sold 94,292 Omnicare shares for proceeds of $5,045,135.08.

109.    During the Relevant Period Defendant Hutton sold 89,300 Omnicare shares for proceeds of $4,758,329.20.

110.    During the Relevant Period Defendant Gemunder sold 4,102 Omnicare shares for proceeds of $235,681.40.

111.    During the Relevant Period Defendant Froesel sold 890 Omnicare shares for proceeds of $51,124.48.

112.    The Defendants insider stock sales are set forth below:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Edward L. Hutton | 09/02/2005 | 39.150 | $52.45 | $2.053.417.50 |
|  | 11/08/2005 | 47.765 | $53.75 | $2.567.368.75 |
|  | 12/01/2005 | 2.385 | $57.67 | $137.542.95 |
|  |  | **89,300** |  | **$4,758,329.20** |
| Joel F. Gemunder | 11/10/2005 | 1,359 | $55.73 | $75,737.07 |
|  | 01/09/2006 | 2,743 | $58.31 | $159,944.33 |
|  |  | **4,102** |  | **$235,681.40** |
| David W. Froesel, Jr. | 11/10/2005 | 299 | $55.73 | $16,663.27 |
|  | 01/09/2006 | 591 | $58.31 | $34,461.21 |
|  |  | **890** |  | **$51,124.48** |
| **Total** |  | **94,292** |  | **$5,045,135.08** |

## INDIVIDUAL DEFENDANTS' ACCOUNTING FRAUD AND FALSE FINANCIAL REPORTING DURING THE RELEVANT PERIOD

### Summary of Accounting Fraud and Financial Reporting

113.    In order to artificially inflate Omnicare's stock price, Individual Defendants falsely reported Omnicare's financial results prior to and during the Relevant Period through the use of improper revenue recognition and overvaluation of receivables and

inventory, among numerous other significant accounting improprieties, thereby materially overstating its net income, EPS and financial position during that period. Absent the improper accounting, Omnicare would have reported materially lower net income and EPS.

114.   Omnicare's bogus financial results were included in 2Q and 3Q 2005 Forms 10-Q as filed with the SEC. The results, and Individual Defendants' representations about them, were false and misleading when made because, prior to and during the Relevant Period, Omnicare's financial statements did not fairly present its results and financial position and were presented in violation of GAAP and SEC rules. Individual Defendants intentionally failed to properly record revenues and overvalued their inventory and accounts receivables which resulted in materially overstating net income, EPS and the financial position as reported on the 2Q and 3Q 2005 Forms 10-Q. Additionally, Individual Defendants knowingly failed to adequately disclose their accounting policies as it pertains to recording revenues, receivables and inventory.

115.   GAAP are principles recognized by the accounting profession as the conventions, rules and guidelines that define accepted accounting practice at a particular time. SEC Regulation SX (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which

would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

116.    Omnicare was able to disguise their fraudulent accounting schemes through a systemic process of intentionally ignoring GAAP and SEC rules, creating fictitious transactions, and maintaining an accounting and business environment lacking internal controls. As discussed in detail herein, numerous former employees of Omnicare provided substantial and credible information indicating that the Company improperly recognized revenue and overvalued receivables and inventory by, among other things:

> a. Improper revenue recognition – Omnicare improperly recorded sales for which the earnings process was not complete, persuasive evidence of arrangements did not exist, delivery did not occur and collectibility was not reasonably assured.

> b. Overvaluation of receivables – Omnicare overvalued their receivables by including receivables for which sales were improperly recorded, collection was never probable or reasonable assured and knowingly failed to adequately provide reserves for these and other uncollectible receivables as a charge to earnings.

> c. Overvaluation of inventory – Omnicare overvalued their inventory by not recording inventory at the lower of their cost or market value and intentionally failing to reserve for and write-off expired and obsolete products from their balance sheet as a charge to earnings.

117.    Furthermore, Individual Defendants intentionally and recklessly failed to maintain an effective system of internal controls over disclosures and financial reporting which enabled them to fraudulently inflate Omnicare's net income, EPS and the financial position of the Company. Individual Defendants falsely represented to the public in their 2Q and 3Q 2005 financial statements filed on Forms 10-Q with the SEC, as being "effective." Had Omnicare implemented a sufficient control environment, Individual Defendants would have been precluded form engaging in their scheme to artificially manipulate the financial performance and position of Omnicare prior to and during the Relevant Period.

**The GAAP Violations Were Material**

118.    The false and misleading Relevant Period statements and omissions regarding Omnicare's accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

119.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

*       *       *

•       whether the misstatement masks a change in earnings or other trends

• whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\* \* \*

• whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

120. Moreover, the SEC has been clear that a company's intentional misstatements are material. SAB Topic 1M specifically addresses intentional misstatements stating that in certain circumstances intentional **immaterial misstatements are unlawful and that registrants must comply with SEC regulations:**

[Registrants] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. . . . Accordingly, **failure to record accurately immaterial items, in some instances, may result in violations of the securities laws.**

121. Omnicare's improper conduct also involved false and misleading statements and omissions involving material but non-quantitative items. Omnicare intentionally failed to disclose certain known trends and uncertainties required under SEC regulations that the Company reasonably expected to have a material unfavorable impact on the Company's operations. In fact, the Individual Defendants' omissions in Omnicare's financial statements and press releases lead to a distorted picture of the Company's operations such that its reported earnings did not accurately reflect its operating results.

122. SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

123.    Omnicare's misstatements, by their own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Omnicare's Improper Revenue Recognition**

124.    In order to artificially inflate the price of Omnicare's stock prior to and throughout the Relevant Period, Individual Defendants knowingly engaged in a scheme which to improperly recognize revenue on sales for which the earnings process was not complete, persuasive evidence of arrangements did not exist, delivery did not occur and collectibility was not reasonably assured. Individual Defendants overrode and circumvented GAAP and SEC guidelines and improperly inflated reported revenues, net income and EPS by improperly recognizing revenue on sales for which products were never provided, services never rendered, no arrangements to provide services or products existed and collection of related receivables were not reasonably assured.

125.    Individual Defendants improperly recorded revenues for products that were never delivered and for services that were never rendered to LTC facilities, Medicare beneficiaries and privately insured individuals. Prior to and during the Relevant Period, Individual Defendants submitted claims and invoices to LTC facility residents for prescriptions that were never ordered or for which the prescriptions were never provided to the LTC facilities, Medicare beneficiaries and privately insured individuals. Furthermore, Individual Defendants submitted claims for services that were never rendered to LTC facilities, Medicare beneficiaries and privately insured individuals. In certain circumstances, Individual Defendants did provide products and render services, but continued to submit multiple claims and invoices for these products and services. Individual Defendants relied on these false and repetitive claims to inflate

Omnicare's net income, EPS and financial position prior to and during the Relevant Period.

126.    According to CW1, Omnicare had the ability to, and did, monitor such fictitious claims via internally generated reports referred to as Duplicate Claims Reports and Duplicate Pharmacy Reports. Such reports detailed duplicate prescriptions and services on both the medical and pharmacy segment of Omnicare's fraudulent business. Omnicare went as far as to monitor these bogus claims by member number, month and date of service.

127.    Financial Accounting Standards Board ("FAS") Statement of Concepts ("FASCON") No. 5 ¶84(a) states in part that "two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." Additionally, FASCON No. 5 ¶83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Individual Defendants knowingly ignored the basic premise of FASCON No. 5 requiring the delivery of merchandise or rendering services and fraudulently recorded revenue on sales for which merchandise was not delivered or services were not rendered.

128.    SAB Topic 13, Revenue Recognition, §A1 states in part:

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and,

- Collectibility is reasonably assured.

129.   SAB Topic 13 §A3, Delivery and Performance, further defines the concept of delivery and performance and states in part: "The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site . . . ."

130.   Individual Defendants recorded revenues related to fictitious claims and invoices for which there was no evidence of an arrangement and for which delivery has not occurred or services have not been rendered. As such, Individual Defendants ignored the basic premises of SAB Topic 13 in their quest to falsely inflate net sales, net income, EPS and financial position prior to and during the Relevant period.

131.   Individual Defendants recorded revenues on claims in which collection of such receivables was not reasonably assured in direct violation of SAB Topic 13. Furthermore and as discussed in ¶¶132-136 below, Omnicare failed to adequately reserve and write-off such receivables as a charge to expenses in the appropriate period.

**Omnicare's Improper Valuation of Receivables**

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

132.    Individual Defendants fabricated a scheme to inflate earnings and financial position of Omnicare by ignoring the most basic theories of accounting which require doubtful receivables to be reserved for and uncollectible receivables to be written-off as charges to earnings in the applicable reporting period. Individual Defendants allowed obvious uncollectible receivables to remain on their balance sheet with no corresponding reserves or write-off of uncollectible accounts. Additionally, Individual Defendants improperly recognized revenue on these transactions knowing collections were not reasonably assured in violation of SAB Topic 13 as noted in ¶¶128-131 above.

133.    According to CW4, it was management's decision not to adequately reserve for doubtful receivables and not to write-off know uncollectible receivables. CW4 submitted reports to defendant Gemunder and management that detailed which receivables required to be written-off.  The basis for the required write-off was that all collection efforts have been exhausted and no future collections were reasonably assured. It was CW4's experience that defendant Gemunder denied almost every receivable write-off. Individual Defendants knew that if they began to write-off bogus receivables due from customers that they continued to do business with, that all current and past sales transactions with such customers would be jeopardized as GAAP does not allow revenue recognition when "***collectibility is [not] reasonable assured***." These patients did not have immaterial outstanding receivable balances, rather substantial balances due ranging from $400,000 to $2 million per account. Furthermore, CW4 indicated that the Individual Defendants failed to reserve or write-off receivables for debtors that have entered into bankruptcy proceedings. CW4 estimated that up to 60% of Omnicare's receivables were worthless, which equates to over $625 million and

$850 million for the quarters ended June 30, 2005 and September 30, 2005, respectively. Had Individual Defendants properly accounted for Omnicare's uncollectible accounts and current transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated.

134.   CW5, further detailed the collection issues within the geographic region for which she was responsible for collections. CW5 estimated that 25% of all individuals in LTC's located in her assigned region lacked prescription benefits. CW5 further indicated that of those individuals lacking prescription benefits that 40-60% lacked the resources to pay their debt balance due to Omnicare. If CW5's region is representative of all Omnicare's locations, Omnicare's net income before taxes would be overstated by at least $130 million and $175 million for the quarters ended June 30, 2005 and September 30, 2005, respectively. Had Individual Defendants properly accounted for these transactions, Omnicare's net income and EPS during the Relevant Period would be completely eliminated.

135.   Omnicare's failure to reserve for and write off uncollectible receivables was in violation of GAAP and SEC rules. When it is believed receivables will likely become uncollectible, GAAP mandates that an allowance be recorded by incurring an expense in the period that this becomes known. Such reserves are required by Statement of Financial Accounting ("SFAS") No. 5, Accounting for Contingencies. SFAS No. 5.

> An estimated loss from a loss contingency [*e.g.*, collectibility of receivables] . . . shall be accrued by a charge to income if *both* of the following conditions are met: (a) Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. . . . (b) The amount of loss can be reasonable estimated.

136.    Similarly, GAAP requires "[a]n expense or loss [to be] recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated." *See* FASCON No. 5 ¶87. Defendant purposely ignored these requirements and falsely inflated their net income and EPS prior to and during the Relevant Period by not adequately reserving for and failing to write-off uncollectible receivables.

**Omnicare's Improper Inventory Valuation**

137.    Individual Defendants artificially inflated Omnicare's profitability by improperly overvaluing their inventories and improperly including expired and obsolete products in their inventory balances. Individual Defendants unethically and illegally commingled expired pharmaceutical drugs with ones that were current for purposes of maintaining false and tainted inventory levels, understating related costs of goods sold and undermining patients' healthcare requirements.

138.    According to CW2, drugs that were returned to their facilities were commingled with similar drugs in other vials. However, in many instances the returned drugs had expired and were worthless. Additionally, pharmacy personnel received products that came back in the form of blister packs. Pharmacy personnel would open the returned blister packs and put the individual pills in generic vials that included pills from other lots and with varying expiration dates. CW2 noted that many of the vials, as many as 150 in one location, lacked expiration dates to facilitate the commingling of expired and possibly incompatible drugs. This practice was also corroborated by CW3.

139.    This illegal practice nullified the integrity of the Omnicare's inventory and the values assigned to these products. Omnicare was required to destroy these expired

products and immediately write them off of their balance sheet as a charge to earnings. By ignoring these requirements, Individual Defendants were able to inflate their net income and EPS, prior to and during the Relevant Period.

140.   GAAP and SEC rules require companies to carry their inventories at the lower of cost or market. Market means current replacement cost either by purchase of reproduction, except that market should not exceeds its net realizable value. Accounting for inventory under GAAP is set forth in Accounting Research Bulletin No. 43 ("ARB 43"), Chapter 4, Inventory Pricing. ARB 43, Chapter 4, Statement 3 defines inventory costs as "the primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset.  As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location." ARB 43, Chapter 4, ¶5, further defines cost as "the definition of cost as applied to inventories is understood to mean acquisition and production cost." Companies are precluded from recording and valuing their inventory above their cost and to include other expenses in their basis for inventory. However, that is exactly what Individual Defendants did in order to artificially inflate net income and prior to and through out the Relevant Period.

141.   Furthermore, GAAP and SEC guidelines require companies to immediately record inventory losses whenever the value of the inventory is less than its cost, regardless of the cause of the loss in value. Accounting for inventory under GAAP is set forth in ARB 43, Chapter 4, Inventory Pricing. ARB 43, Chapter 4, ¶8, states: "[I]n accounting for inventories, a loss should be recognized whenever the utility of goods is

impaired by damage, deterioration, obsolescence, changes in price levels, or other causes . . . recognized and accounted for in the current period." ARB No. 43 Statement 5 states in part that "a departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period." This is generally accomplished by stating such goods at a lower level commonly designated as market. Ordinarily, market is defined as replacement cost or net realizable value at the balance sheet date.

142.    Throughout the Relevant Period, Omnicare had accumulated a vast amount of improperly valued inventory and inventory that was tainted, expired and obsolete. Much of this inventory was worthless and had no market while the remaining could only be sold for substantially below its recorded book value and its costs. GAAP, as required by ARB 43 and SFAS No. 5, calls for companies to record valuation allowances (which increase expense and reduce the recorded value of inventory) in the current period, in order to adjust inventory values to the lesser of cost or net realizable value. Omnicare ignored these rules and failed to write-down expired and worthless inventory prior to and throughout the Relevant Period thereby inflating net income and EPS.

**Additional GAAP and SEC Violations**

143.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

in the financial statements. *See* FASCON No. 1, ¶7. For this reason, in addition to the Individual Defendants' failure to make the required disclosures in Omnicare's financial statements and in its SEC filings, the Individual Defendants also shirked their duty to make such disclosures in conference calls and press releases.

144. Due to these accounting improprieties, the Individual Defendants presented Omnicare's financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

a. The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

b. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON No. 1, ¶34);

c. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASCON No. 1, ¶40);

d. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. And to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general (FASCON No. 1, ¶50);

e.  The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASCON No. 1, ¶42);

f.  The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON No. 2, ¶¶58-59);

g.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASCON No. 2, ¶79); and

h.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON No. 2, ¶¶95, 97).

145.  Moreover, Individual Defendants' undisclosed, adverse, material information during the Relevant Period is the type of information that, because of SEC

regulations, national stock-exchange regulations and customary business practice, investors and securities analysts expect to be  disclosed and that corporate officials and their legal and financial advisors know to be the type of information that must be disclosed.

**Omnicare Certified False and Misleading Financial Results**

146.   Defendants Gemunder and Froesel knowingly certified false and misleading financial statements for the 2Q 2005 and 3Q 2005 filed on Forms 10-Q with the SEC on August 9, 2005 and November 8, 2005, respectively. These financial statements were not in accordance with GAAP or SEC rules. Section 302 of the Sarbanes-Oxley Act and SEC Rules 13A-14(a) and 15D-14(a) of the Exchange Act requires defendants Gemunder and Froesel as the chief executive officer and chief financial officer, respectively, to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report. Defendants Gemunder and Froesel are required to certify that the financial statements and other financial information included in the reports are fairly presented in all material respects. Defendants Gemunder and Froesel also stated that the report did not contain any untrue statement of material fact or omit to state a material fact. In addition, defendants Gemunder and Froesel stated that Omnicare has established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

147.   Defendants Gemunder and Froesel knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

Under §906 of the Sarbanes Oxley Act and 18 U.S.C. §1350, defendants Gemunder and Froesel were required to certify each periodic report that includes financial statements. Their signed certification falsely stated that: (i) the report fully complied with the requirements of §§13(a) or 15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of Omnicare.

**Omnicare Failed to Make Required Disclosures**

148.   The SEC requires that, as to annual and interim financial statements filed with the SEC, registrants include a management's discussion and analysis section which provides information with respect to the results of operations and "also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." *See* Regulation S-K, 17 C.F.R. §229.303. Regulation S-K states that, as to annual results, the management's discussion and analysis section shall:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed. 17 C.F.R. §229.303(a)(3).

149.    The SEC also requires that, interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations shall be provided so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b), states that "[t]he discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item, except that the impact of inflation and changing prices on operations for interim  periods need not be addressed."

150.    During the Relevant Period, the Individual Defendants failed to properly disclose Omnicare's accounting policies related to improper revenue recognition and overvaluation of receivables and inventory, among numerous other significant accounting improprieties, and the unfavorable impact that improperly recording such transactions would have on the Company's net income, EPS and financial position.

**Omnicare Lacked Adequate Internal Controls**

151.    Individual Defendants were able to scheme Omnicare shareholders and inflate Omnicare stock prices through accounting improprieties which resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over financial disclosures and reporting.

152.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

\*       \*       \*

(ii) transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP] . . . .

15 U.S.C. §78m(b)(2)(A)-(B).

153.   These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books, and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

154.   Individual Defendants caused Omnicare to violate §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning improper revenue recognition and over valuation of receivables and inventory, among numerous other significant accounting improprieties. Omnicare's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods. Accordingly, Omnicare violated §13(b)(2)(A) of the Exchange Act.

155.   In addition, Individual Defendants caused Omnicare to violate §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Omnicare failed to ensure that proper review and checks were in place to ensure that it was properly recognizing revenues, valuing of inventories and receivables and properly recording reserves for inventories and receivables. In fact, despite knowing the true dismal state of the Company's lack of adequate controls, Individual Defendants issued quarterly financial statements throughout the Relevant Period without ever disclosing the deficiencies in Omnicare's disclosure controls.

156.   Individual Defendants fraudulently disclosed the effectiveness of their controls over disclosures and financial reporting with the SEC in their 2Q 2005 and 3Q 2005 financial statements filed on Forms 10-Q on August 9, 2005 and November 8, 2005, respectively, by stating in part:

"(a) Based on a recent evaluation, as of the end of the period covered by this Quarterly Report on Form 10-Q, the Company's Chief Executive Officer and Chief Financial Officer, have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rule 13a-15(e) and 15d-15(e)) are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in periodic reports filed or submitted under the Securities and Exchange Act of 1934."

157.   As Individual Defendants allowed and were responsible for initiating a gross lack of internal controls over disclosures and financial reporting, Individual Defendants were enabled to scheme Omnicare shareholders and inflate stock prices through accounting improprieties which resulted in  materially misstated publicly filed financial statements.

## DEMAND WOULD BE FUTILE

158.   Plaintiff brings this action derivatively in the right and for the benefit of Omnicare to redress injuries suffered and to be suffered by Omnicare as a result of the breaches of fiduciary duty by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

159.   Plaintiff will adequately and fairly represent the interests of Omnicare and its shareholders in enforcing and prosecuting its rights.

160.   Plaintiff is an owner of Omnicare common stock and was an owner of Omnicare common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

161.   Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile. At the time these derivative actions were commenced, the board of directors consisted of nine members: Edward L. Hutton, Joel F. Gemunder, John T. Crotty, Charles H. Erhart, Jr., David W. Froesel, Jr., Sandra E. Laney, Andrea R. Lindell, John H. Timoney and Amy Wallman. As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

162.   All of these directors face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company.

**Additional Likelihood of Substantial Liability of the Audit Committee Defendants.**

163.   Derivative Defendants Erhart, Lindell, Timoney and Wallman had enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged by § 301 of the Sarbanes-Oxley Act with direct responsibility

for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with  financial reporting and financial controls. Defendant Erhart has been determined to be a "financial expert" as required by § 307 of the Sarbanes-Oxley Act. As a person of special knowledge and talents, more is expected of Erhart in preventing and ferreting out fraud and inadequate financial controls than of other directors.

164.    Given the size, scope, and blatancy of the accounting violations and misrepresentations described above, the Audit Committee members either knew of the financial manipulations or turned a blind eye to them.   Such conduct is also not protected by the business judgment rule and exposes these five Individual Defendants to a substantial threat of liability in this action.

165.    In addition, should Defendants Erhart, Lindell, Timoney and Wallman decide to bring claims against themselves, that would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

**The Directors of the Company Lack Independence**

166.    Director Defendant Hutton held an executive position as Chairman of the Company from 1981 until May 2003.  As a former executive of the Company, Hutton lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

167.    Director Defendant Gemunder, as the Company's current President and CEO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

168.   Director Defendant Froesel, as the Company's current Senior Vice President and CFO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

169.   The spouse of Director Defendant Laney is the Vice President – Management information Systems of the Company.  As such, Defendant Laney lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

170.   The Proxy Statement filed by the Company on April 13, 2005 states that Directors Hutton, Gemunder, Froesel and Laney are not independent according to NYSE standards.  The Proxy Statement filed by the Company on April 13, 2006 states that Directors Hutton, Gemunder, and Laney are not independent according to NYSE standards.

171.   Director Defendants Hutton, Gemunder, Erhart, Laney, and Timoney are all also members of the Board of Directors of Chemed Corporation.   Director Defendants Hutton, Gemunder and Laney are also former officers of Chemed.  Hutton was the President and CEO of Chemed from 1970 to 1993, and was Chairman and CEO of Chemed from 1993 until May 2001.  Laney was Executive Vice President and Chief Administrative Officer of Chemed from May 2001 and May 1991, respectively, until March 2003.  From November 1993 until May 2001, she was Senior Vice President of Chemed.  From May 1984 to November 1993, she was a Vice President of Chemed.  Because of these overlapping board memberships, Director Defendants Hutton, Gemunder, Erhart, Laney, and Timoney lack the sufficient independence with which to

render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

172.   Should Director Defendants decide to bring claims against themselves, that would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

173.   In addition, demand would be a futile and useless for the additional following reasons:

a.   Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b.   The Director Defendants of Omnicare, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Omnicare's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.   Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.   In order to bring this suit, a majority of the Directors of Omnicare would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d.   The acts complained of constitute violations of the fiduciary duties owed by Omnicare's officers and directors and these acts are incapable of ratification; and

e.   Omnicare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Omnicare any part of the damages Omnicare suffered and will suffer thereby;

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

174.    Plaintiff has not made any demand on the shareholders of Omnicare to institute this action since demand would be a futile and useless act for the following reasons:

    a. Omnicare is a publicly held company with approximately 106.58 million shares outstanding, and thousands of shareholders;

    b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c. Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

175.    Omnicare has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.   Such expenditures will include, but are not limited to:

    a. Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

    b. Costs incurred in relation to the current investigation by the U.S. Attorneys office in Massachusetts.

    c. Costs incurred in relation to the current investigation by the Michigan Attorney General's office.

    d. Costs incurred in relation to the current investigation by the Ohio Attorney General's office.

    e. The charge incurred by the Company to establish a litigation fund related to the investigations and litigation.

    f. Needless costs associated with the implementation of Medicare D.

    g. Costs to acquire competitors which were purchased in order to conceal the monthly bed loss.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

176.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

177.   The Individual Defendants owed and owe Omnicare fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Omnicare the highest obligation of good faith, fair dealing, loyalty and due care.

178.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

179.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance, and that they had caused the Company to be in violation of state and federal laws.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Omnicare has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

182.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

183.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Omnicare, for which they are legally responsible.

184.   As a direct and proximate result of the Individual Defendants' abuse of control, Omnicare has sustained significant damages.

185.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

187.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

188.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Omnicare in a manner consistent with the operations of a publicly held corporation.

189.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Omnicare has sustained significant damages in excess of millions of dollars.

190.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

192.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

193.   As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Omnicare to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

194.   As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

195.   Plaintiff, on behalf of Omnicare, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Director Defendants
### for Unjust Enrichment

196.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

197.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Omnicare.

198.   Plaintiff, as shareholder and representative of Omnicare, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits,

benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against Defendants Hutton, Gemunder, and Froesel for Breach of Fiduciary Duties, for Insider Selling and for Misappropriation of Information

199.    Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

200.    At the time of the stock sales set forth herein by Defendants Hutton, Gemunder, and Froesel, they knew the information described above and sold Omnicare common stock on the basis of such information.

201.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Defendants Hutton, Gemunder, and Froesel used for their own benefit when they sold Omnicare common stock.

202.    Defendants Hutton, Gemunder, and Froesel's sale of Omnicare common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

203.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Hutton, Gemunder, and Froesel's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.     Awarding to Omnicare restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 27, 2006                    Respectfully Submitted,

                                    __s/William B. Federman_____
                                    William B. Federman
                                    FEDERMAN & SHERWOOD
                                    120 N. Robinson, Suite 2720
                                    Oklahoma City, OK  73102
                                    Phone:  (405) 235-1560
                                    Fax:  (405) 239-2112
                                    wfederman@aol.com

and

Bradford P. Bollmann
BOLLMANN LAW OFFICE, PLLC
2321 Lime Kiln Lane, Suite B
Louisville, KY  40202
Phone:  (502) 425-9450
Fax:  (502) 425-9451
bpb@bollmannlaw.com

Counsel for Plaintiff

I:\OmnicareInc\Pleadings\ComplaintAmended.doc

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:


Wm. T. Robinson III (wtr@gdm.com)
Carrie A. Shufflebarger (cas1@gdm.com)
A.J. Schaeffer (ajs@gdm.com)
GREENEBAUM DOLL & MCDONALD PLLC
50 East RiverCenter Blvd.
Covington, KY 41012
(859) 655-4200
*Counsel for Individual Defendants*


Richard W. Reinthaler (lpmco@dbllp.com)
James P. Smith III (jpsmith@dbllp.com)
John E. Schreiber (lpmco@dbllp.com)
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-7602
*Counsel for Individual Defendants*

Gerald F. Dusing (gdusing@aswdlaw.com)
ADAMS, STEPNER, WOLTERMANN & DUSING PLLC
40 West Pike Street
P.O. Box 861
Covington, KY 41012-861
*Counsel for Nominal Defendant Omnicare, Inc.*


____s/William B. Federman_____
William B. Federman
Counsel for Plaintiff